Anthony REVIS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 83–106 S.

United States District Court,
D. Rhode Island.

Feb. 18, 1983.

Salter, McGowan, Swartz & Holden, Justin Holden, Richard C. Bicki, Providence, R.I., for plaintiff.

Lincoln C. Almond, U.S. Atty., Seymour Posner, Asst. U.S. Atty., Providence, R.I.,

Glenn L. Archer, Jr., Asst. Atty. Gen., Robert G. Nath, Trial Atty., D. Patrick Mullarkey, Chief, Civil Trial Section, Northern Region, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SELYA, District Judge.

This is a civil action for judicial review of jeopardy assessments imposed by the Internal Revenue Service ("Service") anent federal income taxes allegedly owed by the taxpayer-plaintiff for calendar years 1979 and 1980. Jurisdiction of the Court has been invoked pursuant to 26 U.S.C. § 7429.

It appears that on January 13, 1983, the Service made certain assessments for the years in question against the plaintiff;[1] that said assessments, together with a demand for immediate payment, were served on the following day; that on January 19, 1983, a formal notice of assessment, accompanied by advices as to the taxpayer's rights of appeal, was served; that plaintiff promptly filed his protest and a request for expedited administrative review; that such review was had; and that the Service on February 4, 1983, through a duly-designated appeals officer, refused to modify or abate the assessments. The instant action was filed in this Court on February 8, 1983.

These jeopardy assessments were made by the District Director of the Internal Revenue Service pursuant to 26 U.S.C. § 6861, which states in pertinent part:

If the Secretary or his delegate believes that the assessment or collection of a deficiency, as defined in § 6211, will be jeopardized by delay, he shall, notwithstanding the provisions of § 6213(a), immediately assess such deficiency (together with all interest, additional amounts, and additions to the tax provided by law), and notice and demand shall be made by the

Secretary or his delegate for the payment thereof.

26 U.S.C. § 6861(a).

The jeopardy assessment is a singular weapon in the Service's armamentarium. In the ordinary course of events, there is generally a time-consuming ritual which is enacted from the initial notice of a putative tax deficiency to the point of compulsory payment, a ritual which wends at a relatively leisurely pace through a labyrinth of administrative avenues and which finds its ultimate way to the Tax Court and to yet loftier judicial reaches (should appeals be pursued)—all without the taxpayer's silver actually crossing the Service's palm. When the Service, however, properly resorts to the heavy artillery of § 6861 (the firing pin of which is a determination that collection of the tax may be in jeopardy), it is empowered in effect to truncate the ritual, forego its customary procedures, and assess and collect the claimed deficiency straightaway.

Prior to the enactment of the Tax Reform Act of 1976, no immediate judicial review of jeopardy assessments was available to taxpayers. *See Davis v. United States,* 511 F.Supp. 193, 196 (D.Kan.1981). *See also* 4 U.S.Cong. & Adm.News 1976, 2897, 3789, at p. 390. 26 U.S.C. § 7429, enacted as a part of the Tax Reform Act of 1976,[2] did confer upon taxpayers some defensive armor, in making provision for both administrative and judicial review of jeopardy assessments. These provisions may be succinctly summarized as follows:

1. Within five days after the jeopardy assessment is made, the Service must furnish the taxpayer with a written statement of the information relied upon in formulating the assessment;

2. Within thirty days thereafter, the taxpayer may request administrative review;

---

1. The amounts assessed were as follows:

| TAXABLE YEAR | TAX | PENALTY | INTEREST | TOTAL |
|---|---|---|---|---|
| 1979 | $11,160.22 | $ 5,580.01 | $4,424.88 | $21,164.91 |
| 1980 | $23,986.32 | $11,993.16 | $6,632.05 | $42,611.53 |
| | | | TOTAL | $63,776.44 |

2. These provisions were enacted on October 4, 1976 as § 1204(a) of P.L. 94–455.

3. Upon such request, the Service must expeditiously determine if the action was reasonable and the amount of the assessment was appropriate.

 If such administrative review is unavailing, the taxpayer may bring suit under 26 U.S.C. § 7429. The district court's function is limited to a determination as to whether the imposition of the assessment is reasonable under the circumstances; and if so, whether the amount so assessed is appropriate under the circumstances. As to the first of these inquiries, the burden of proof rests with the Service; as to the latter, the burden of proof rests with the taxpayer. *Davis v. United States,* 511 F.Supp. at 197; *Loretto v. United States,* 440 F.Supp. 1168, 1171 (E.D.Pa.1977). While the standard to be applied in measuring the Service's actions is something more than the mere avoidance of arbitrary or capricious conduct, it is, conversely, something less than a substantial-evidence-on-the-record test. *Id.* at 1172. The determination of the district court in the premises is final, and no further appeal lies. *See* 26 U.S.C. § 7429(f).

 In ascertaining the "reasonableness" of the Service's conduct, the Congress has given scant guidance to the district courts. Other than the "jeopardized by delay" criterion embodied in 29 U.S.C. § 6861(a), quoted *supra,* the statute is, as to this point, most notable for its silence. The Service, in its Manual,[3] hypothesizes that the existence of any of three conditions will soundly bottom a jeopardy assessment, to wit:

1. If the taxpayer has left American shores, or appears to be designing so to depart with unseemly haste; or

2. If the taxpayer has placed, or appears to be designing quickly to place, his assets beyond the reach of the government by transfers abroad or to third parties, or by dissipation; or by concealment; or

3. If the taxpayer's fiscal solvency appears to be imperiled.

The legislative history of § 7429 indicates congressional approval of the standards set forth in the Manual. *See* Senate Finance Committee, S.Rep. No. 94–938 (part II), 94th Cong., 2d Sess., 360 n. 1 (1976). Even accepting these conditions, if extant, as sufficient in law to trigger jeopardy assessments, it is well settled that this Court's review is not in any way, shape or form restricted thereto. *Fidelity Equipment Leasing Corp. v. United States,* 462 F.Supp. 845, 849 (N.D.Ga.1978).

The judicial review envisaged by Congress in enacting 26 U.S.C. § 7429 is limited not only in its scope, but also in its effect. The Senate Finance Committee, in explaining the intended effect of a district court's determination under § 7429, made this clear (S.Rep. No. 94–938, *supra,* at 365, U.S. Code Cong. & Admin.News 1976, p. 3795):

A determination made under new § 7429 *will have no effect upon the determination of the correct tax liability in a subsequent proceeding.* The proceeding under the new provision is to be a separate proceeding which is unrelated, substantively and procedurally, to any subsequent proceeding to determine the correct tax liability, either by action for refund in a federal district court or the Court of Claims or by a proceeding in the Tax Court. [Emphasis added.]

 The reviewing court's decision is not, therefore, to be treated as a determination of the merits of the tax liability. Since a § 7429 review is a summary proceeding, the hearing is not necessarily governed in all respects by the usual rules apposite to admissibility which would be in effect at a trial on the merits. The statute directs the district court to review the "information" upon which the Service relied. In this regard, S.Rep. 94–938, *supra* at 365, U.S.Code Cong. & Admin.News 1976, p. 3794, specifically provides that:

[t]he Court is to take into account not only information available to the Service at the time of the assessment but also

---

**3.** *See* Treas.Reg. 1.6851–1(a) (1978).

*any other* information which bears on these issues. [Emphasis added.]

*Accord, Robinson v. Boyle,* 46 A.F.T.R.2d 80–5078 (E.D.Va.1980) ("Courts have considered all information possessed by the Service, even though such information may be inadmissible in a trial on the merits of the tax liability issue"); *Hurst v. United States,* 47 A.F.T.R.2d 81–509 (N.D.Fla.1980) (§ 7429 is a "summary proceeding in which hearsay and other usually inadmissible evidence may be considered, and rough determinations must necessarily be made"); *Bryan v. United States,* 81–1 U.S.T.C. 86,-029 (N.D.Fla.1980) ("Strict standards of evidentiary admissibility need not be used so long as the evidence presented could have reasonably been used by the Internal Revenue Service"). *See also Eriksen v. United States,* 45 A.F.T.R.2d 80–1053 (E.D.Mich.1980).

An evidentiary hearing in the case at bar was held within the statutory 20-day period. The only witnesses who testified were Special Agent John P. McHale III of the Service[4] and Mrs. Flora A. Levesque, employed as branch manager by Columbus National Bank of Rhode Island. The plaintiff opted not to offer any witnesses.

At the outset, it should be noted that the plaintiff has questioned the constitutionality of the entire jeopardy assessment paradigm on due process and equal protection grounds. The authorities cited by the plaintiff, however, simply do not support the proposition which he advances. All of the cases relied upon were decided prior to the engrafting upon the statute of the ameliorative review provisions of 26 U.S.C. § 7429. Further, even those hoary cases recognize that the collection of revenue by the government constitutes an important public interest such that, if there is a special need, delay in the judicial determi-

nation of property rights may well be justified. *See, e.g., Fuentes v. Shevin,* 407 U.S. 67, 90–92, 92 S.Ct. 1983, 1999–2000, 32 L.Ed.2d 556 (1972). Subsequent to the enactment of the prophylactic review mechanism contained in 26 U.S.C. § 7429, constitutional challenges to the validity of the jeopardy assessment device have routinely been rejected by the courts. *See, e.g., Haskin v. United States,* 444 F.Supp. 299, 304 (C.D.Cal.1977); *Fidelity Equipment Leasing Corp., supra,* 462 F.Supp. at 850. This Court heartily concurs. The statutory scheme provides a taxpayer with notice of governmental action and with an expedited administrative review; thereafter the judicial review afforded allows the taxpayer to examine witnesses, present evidence and receive a swift *de novo* determination in the courts. The high priority which must logically be accorded to revenue collection justifies the extraordinary procedures Congress has ordained in 26 U.S.C. § 6861.

The plaintiff has also raised in his complaint a contention[5] that the notice provided by the Service in connection with the jeopardy assessments falls short of the statutory mandate of 26 U.S.C. § 7429(a)(1). A copy of the notice, and of the attachments transmitted therewith (comprising in all six pages) is appended hereto as Appendix "A". It appears to the Court that this notice indeed comports with the statutory directive, and furnishes an adequate exposition of the information relied upon by the Service in making the assessments. In any event, respectable authority holds that a failure to satisfy the notice requirement of 26 U.S.C. § 7429(a)(1) does not, in and of itself, invalidate the proceedings. As Judge Murphy stated in *Fidelity Equipment Leasing Corp., supra,* 462 F.Supp. at 848:

"[t]he legislative history of this section indicates that both the notice and admin-

---

**4.** The investigation conducted by the Service was a joint criminal/civil examination for the years in question; McHale represented the criminal intelligence division in this team approach.

**5.** The plaintiff has, as it were, "covered the waterfront"; both before the Service and in

this Court, he enumerated no fewer than 12 distinct challenges to the instant assessments. To retain the earlier martial analogy, the government has loosed the rifle-shot of 26 U.S.C. § 6861; and the plaintiff has counter-attacked with a shotgun defense.

istrative review requirements were included simply to facilitate the subsequent Court proceedings."

*See also* S.Rep. 94–938, *supra,* at 365–66. Through pre-trial production of documents, the plaintiff here was fully apprised of the information garnered and relied upon by the Service. In this case, as in *Fidelity,* "[A]ny deficiency in the notice issued by the government is now immaterial." *Id.*

The remaining grounds urged by the plaintiff go to the merits of the controversy. The Court finds the facts to be as follows.

The plaintiff has been an operator of at least three restaurants, using a separate corporation for each, and conducting business under a variety of trade names, e.g., "Tony's Pizza Palace", "Mama Leone's", etc. It can fairly be inferred that these enterprises attract mainly cash customers. His efforts have apparently been at least somewhat successful, as he has amassed not-inconsiderable holdings. In March of 1982, the Service learned, by way of a Currency Transaction Report furnished by Columbus National Bank of Rhode Island, that the plaintiff had established an account at the Swiss Banking Corporation in Geneva, Switzerland, and had in 1980 wire-transferred to that account a large amount of money. There is no evidence that the Swiss account was thereafter closed.

Further scrutiny showed that the plaintiff, in July of 1980, had substantially refinanced a piece of commercial property located at 6921 Post Road, North Kingstown, Rhode Island, thereby reducing much of his equity in that real estate to cash;[6] that he had, on June 10, 1981, sold another parcel of real estate, situated at 30 Mark Drive, North Kingstown, to his brother; that on June 1, 1981, he had substantially mort-

gaged a third parcel of North Kingstown real estate, located at 388 Newcomb Road;[7] and that a further piece of property, also on Post Road, had been on the market, albeit with no purchase having been consummated, for the last several years. These comprised virtually the entire portfolio of the plaintiff's real estate as described in the evidence, save only for a vacant lot (also on Newcomb Road).

By the time the Service attempted to interview the plaintiff (August of 1982), he was abroad. It appears that he and his wife had departed for the Isle of Corfu earlier in 1982 on an "extended vacation"; and that he had given his brother, John Revis, plenary written power-of-attorney over his properties and affairs. This power-of-attorney (Exhibit 3) was later recorded in North Kingstown; from aught that appears, it is still in full force and effect.

It further appears that plaintiff's flagship operating company was Corfu, Inc., which operated "Tony's Pizza Palace" in North Kingstown. In or about May of 1982, plaintiff transferred ownership of the stock of that corporation to John Revis. This transaction was not commemorated by any purchase-and-sale agreement, but was verbal only. According to the version given to Agent McHale, plaintiff, in consideration for this transfer, received a contingent one-fifth interest in a Grecian olive grove.[8] John admitted to McHale that the plaintiff had a parol option to reclaim the stock (and presumably, re-transfer the olive grove rights) "*if* Anthony decided to return to the country." (Emphasis added).

The evidence is uncontradicted that the plaintiff's accounts with Columbus National Bank of Rhode Island had been to all intents and purposes closed in 1980; and that a certificate-of-deposit issued by that insti-

---

**6.** This property had been purchased in mid-1977 for $57,500; the property was refinanced three years later for $80,000, producing a net of $45,000 cash (over existing prior mortgage).

**7.** This property had been purchased on November 14, 1980 for $12,000 and was mortgaged in June of 1981 for $60,000. No explanation of this transaction was made at trial.

**8.** This property was apparently owned by the plaintiff's father, who had arranged with his several children for the granting of fractional interests to them after his death. The father is still alive, however, and the details of the arrangement whereby John would at some future date eventually have received his one-fifth interest were not disclosed at trial.

tution had likewise been liquidated at that time. There was some rather meagre evidence that the plaintiff had at one time maintained accounts at Fleet National Bank (then known as Industrial National Bank) which had also become inactive. Other than Mrs. Levesque's testimony concerning a single nominal account still open at Columbus, no evidence was adduced of any active accounts or any appreciable institutional balances currently maintained by plaintiff within the United States. Lastly, plaintiff had also, virtually on the eve of his departure for Corfu, granted signature and access authority to a relative as to plaintiff's safety-deposit box.

The Service continued to pursue its investigation despite the plaintiff's absence. McHale was initially advised that the plaintiff was expected to return in October of 1982; he did not. In a discussion with plaintiff's counsel, McHale was then told that the plaintiff would return "by Thanksgiving"; he did not. In a further such discussion, the Service was assured of the plaintiff's appearance state-side no later than Christmas of 1982; this assurance, too, proved hollow. It was subsequent thereto that McHale set in motion the jeopardy assessment machinery. It should be noted that, during this dialogue, no plausible reason of any kind was given to the Service for the plaintiff's continued sojourn in Greece.[9] While the plaintiff did return in early February of 1983 (after the jeopardy assessment was an accomplished fact) and while he attended the evidentiary hearing in this Court, he did not testify. The record supports an inference that his wife remained in Greece.

The record further demonstrates that no motor vehicles are currently registered in Rhode Island either to the plaintiff or to his wife. A vehicle had been registered to the plaintiff, but the registration had expired in 1982; it has not been renewed, and there was no record found as to the disposition of this chattel.[10]

It has previously been mentioned that the plaintiff's real estate dealings had left him as the owner of a vacant lot on Newcomb Road in North Kingstown. Subsequent to his departure for Greece, however, his brother John, acting for plaintiff's benefit under the aforedescribed power-of-attorney, proceeded on November 18, 1982 to sell this remaining real estate. It is noteworthy that the power-of-attorney is sweeping in its scope, conferring upon John virtually limitless authority to endorse checks, withdraw funds, disburse monies, convey realty, transfer personal property and otherwise to deal with any and all of the plaintiff's property and assets. In the hands of a trusted ally,[11] it is a handy vehicle for absentee liquidation.

It is appropriate to observe at this juncture that plaintiff, while an American citizen, is a native of Greece; that he has considerable family and business interests there;[12] and that he and his wife own a condominium in Switzerland.

Prior to proceeding with these jeopardy assessments, the taxpayer had been requested to post bond or otherwise secure the government as to any amounts ultimately determined to be due for tax liabilities. The plaintiff, through his counsel, de-

---

**9.** At a meeting which took place on or about February 16, 1983, plaintiff apparently told McHale that his trip to Greece was partially for "health reasons"; and that his delay in returning was at least partially explained by his involvement in an automobile accident abroad in November of 1982. No independent evidence was adduced, however, to corroborate any matters underlying, or otherwise germane to, these allegations. The Court does not, under the circumstances, deem these protestations worthy of belief.

**10.** Again, at the meeting on the day before trial, the plaintiff told McHale that his car had

been involved in an accident in Massachusetts in 1982. This bare statement was not embellished upon in any way at the hearing, nor supported in any manner by extrinsic evidence. The Court does not credit this explanation (if such it be) for the disappearance of the automobile.

**11.** It makes John, in a sense, truly his brother's keeper!

**12.** He owns a restaurant business, and possibly has an ownership interest in a hotel.

clined this invitation, and continues so to decline (as is his right).

■■■ From these facts, the Court is constrained to conclude that the taxpayer is likely to absent himself further from the United States; that he appears to be moving methodically to place his assets beyond the reach of the government; that the Service acted reasonably in concluding that delay might well jeopardize the collection of tax deficiencies;[13] and that the defendant has sustained its burden of proving, by evidence in the instant record, that its issuance of the jeopardy assessments in question was reasonable under the circumstances.[14]

■■ In this context, the Court notes and rejects the arguments of plaintiff's counsel that each of the transfers or other transactions was independently explicable on non-tax-related grounds. Like the employer's lamentations in *Donovan v. Freeway Construction Company,* 551 F.Supp. 869 (D.R.I. 1982), adherence to this myopic view of the evidence would be "to elevate fiction above fact and to sanctify a reverence for coincidence which goes beyond any acceptable level of credulity." *Id.* at 879. Further, assuming *arguendo* that some justifiable explanations did in fact exist (an assumption not documented by credible evidence in this record), purity of motive alone would not be dispositive of the issues. *Johnson v. Commissioner,* 468 F.Supp. 461, 463 (M.D. Fla.1979); *Fidelity Equipment Leasing Corp. v. United States,* 462 F.Supp. at 849; *United States v. Vicknair,* 452 F.Supp. 470, 471 (S.D.Fla.1978). The key consideration must be whether or not the taxpayer appears to be manipulating his property and estate in such a manner as to place them beyond the reach of the government. The answer to this inquiry must, on the instant record, be affirmative.

Similarly, while some doubt legitimately exists as to whether the plaintiff's actions can fairly be characterized as a plan "quickly" to dissipate his assets, speed is, in this sort of analysis, a relative concept. It is true that the acts relied on by the defendant have spanned upwards of two and one-half years; yet the picture emerges, nonetheless, of an orderly premeditated progression which, if continued apace, is reasonably likely to leave the government holding an empty bag. Actions undertaken over a comparable period were found to have been implemented with the requisite celerity in *French v. United States,* 79–2 U.S.T.C. 87,-947 (E.D.Okla.1979). And in *DeLauri v. United States,* 492 F.Supp. 442 (W.D.Tex. 1980), divestiture over a three-year span was held to fit within the statutory rubric. The Court is satisfied that there is sufficient evidence of quickness in this case to fulfil the requirements of 26 U.S.C. § 6861 and of Treas.Reg. 1.6851–1(a) (1978).

The taxpayer also asseverates that his return from Greece proves conclusively that his intentions were and are honorable. The Court can, as noted elsewhere, consider this fact, even though the plaintiff's reemergence on the scene occurred subsequent to the imposition of the jeopardy assessments. *See* n. 14, *ante,* and cases cited thereat. Nothing in the record suggests, however, that this was a pre-planned return, or that it would have come about *but for* the jeopardy volleys unloosed by the Service against plaintiff's assets. It is apparent to the Court that plaintiff returned solely to protect his financial flanks against this unanticipated government sortie. Had the Service not moved summarily to coopt the taxpayer's remaining assets, and had the ongoing liquidation and dispersal of those assets gone uninterrupted, it seems probable that the plaintiff would have remained in his

---

13. The evidence as to the likelihood that deficiencies in fact exist is discussed *infra.*

14. In ascertaining what is "reasonable under the circumstances", the Court has taken into account both what the Service knew when the decision to assess was made, and what it has

subsequently learned. *Accord Fidelity Equipment Leasing Corp. v. United States,* 462 F.Supp. at 849; *Haskin v. United States,* 444 F.Supp. at 304; *Loretto v. United States,* 440 F.Supp. at 1173.

European bivouac. In drawing this inference, both the fact that the plaintiff's wife did not accompany him on his return to American shores and the plaintiff's above-quoted remark to his brother (signifying substantial doubt as to whether plaintiff would return) lend substantial support. Lastly, despite the plaintiff's presence at the trial in this cause, the Court cannot discount the likelihood that, should the jeopardy assessments be dissolved or set aside, plaintiff would, in the Court's judgment, be a prime candidate to wind up his affairs post-haste, pack his bags, and beat a hasty retreat so as to rejoin his spouse in the presumptively greener pastures of his homeland.

■ Let us turn now to the appropriateness of the amount of the assessments. On this issue, the taxpayer bears the burden of proof. 26 U.S.C. § 7429(g)(2). There is an initial presumption that the amounts assessed are suitable. *DeLauri v. United States,* 492 F.Supp. at 446; *Loretto v. United States,* 440 F.Supp. at 1172, n. 7. The district court is not, in a summary proceeding of this nature, the forum for determination of the actual tax liability. *DeLauri v. United States,* 492 F.Supp. at 446; *Haskin v. United States,* 444 F.Supp. at 304.

The Service has computed the suggested deficiencies by the so-called source-and-application-of-funds method. Agent McHale and his colleagues prepared a multi-paginated calculation, bedecked with numerous supporting schedules. The data was taken principally from (i) the tax returns of the plaintiff and of two of his corporations (Corfu, Inc. and TPR, Inc.), (ii) public records anent plaintiff's realty transactions, and (iii) input from plaintiff's relatives and

business cohorts. The resultant analysis was approximate at best; for example, certain expenditures for state withholding taxes were double-counted, and the plaintiff was arguably not given due credit for the possible availability of loan proceeds as a source of funds. Yet this sort of quasi-net-worth approach necessarily relies heavily on probabilities rather than an exclusion with mathematical exactitude and unquestioned certitude of all other alternatives. *Cf. Holland v. United States,* 348 U.S. 121, 138, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954); *Whitfield v. United States,* 383 F.2d 142, 144–45 (9th Cir.1967). The government's imprecisions in the instant case, moreover, cut both ways; by way of illustration, no offset to funds whatever was computed for personal living expenses, nor for the indicated purchase of a motor vehicle in 1980, nor for the repayment in 1979 of a pre-existing loan. It seems likely to the Court that the omissions favoring the government are, in the aggregate, less significant than the omissions favoring the taxpayer.

■ The government established that excess expenditures were made which presumably comprised taxable income not reported, and that tax deficiencies in substantial amounts probably existed both for 1979 and for 1980; and the Court so finds.[15] This being so, the burden was upon the plaintiff to show to what extent the defendant's computations were inappropriate. The plaintiff did not testify; his brother John did not testify; his other relatives did not testify; his business associates did not testify; his accountant did not testify; plaintiff produced no extrinsic evidence of his commercial, real estate, borrowing, investment or other activities. His business

---

**15.** While the government intimated throughout that the plaintiff's excess unreported income represented the fruits of "skimming" restaurant receipts, there was no hard proof as to this point. It is not, however, mandatory that the specific sources of alleged unreported income be pinpointed even where the United States has the burden of proof. *Cf. United States v. Green,* 83–1 USTC ¶ 9175, at 83, 333 (9th Cir. 1983). Here, the defendant showed it to be

likely that the taxpayer's expenditures during the years at issue exceeded reported income; and the source of such excess funds was never satisfactorily explained. *See* Internal Rev. Manual (Audit), Part IV, § 835. This was enough to put the plaintiff to his mettle. *Taglianetti v. United States,* 398 F.2d 558 (1st Cir.1968), a criminal case relied on by the taxpayer, mandates no contrary conclusion.

and financial records were not produced. The plaintiff was content to rely upon cross-examination of McHale and upon arguments of counsel. As was the case in *Gaston v. United States,* 43 A.F.T.R.2d 79–359 (N.D.Ga.1978), the plaintiff produced no evidence; and the result, also, must parallel *Gaston.* The government satisfied the Court that it made a good-faith attempt to measure the extent of the deficiencies, laboring throughout under adverse conditions.[16] Imperfect though it may be, McHale's source-and-application analysis is the best evidence available to the Court. The plaintiff has failed to overcome the presumption of accuracy which attaches to the analysis or to sustain his burden of establishing the extent, if any, to which that analysis, and the resulting assessments, may be inappropriate. Thus, it must perforce stand for purposes of this proceeding, recognizing, as noted above, that it is for a future tribunal in a case of a different genre to fix the precise extent and amount of the tax liability.[17]

Predicated upon the findings of fact and conclusions of law set forth herein, it is hereby ORDERED:

1. That the plaintiff's complaint is denied and dismissed.

2. That the clerk shall forthwith enter judgment for the defendant for costs.

## APPENDIX A

| | |
|---|---|
| Internal Revenue Service | Department of the Treasury |
| District | 130 Broadway, |
| Director | Providence, R.I. 02903 |

Date: January 18, 1983

Mr. Anthony Revis
c/o Salter, McGowan, Swartz and Holden, Inc.
1500 Fleet National Bank
Providence, Rhode Island

---

16. Agent McHale testified that early in the investigation, and roughly coincident with plaintiff's retention of counsel, the plaintiff's relatives and his accountant became "uncooperative". The Court accepts this testimony as true.

## NOTICE OF JEOPARDY ASSESSMENT AND RIGHT OF APPEAL

Dear Mr. Revis:

Under Section 6861 of the Internal Revenue Code, you are notified by the attached fact sheet relating to the specific reasons and facts for asserting the jeopardy assessment which tend to prejudice or render ineffectual collection of U.S. Individual Income Tax for the period 1979 and 1980. Accordingly, based on information available at this time, I have approved assessment of tax and additional amounts determined to be due as reflected in the attached computations:

| Taxable Period | Tax | Penalty | Interest |
|---|---|---|---|
| 7912 | $11,160.02 | $ 5,580.01 | $4,424.88 |
| 8012 | 23,986.32 | 11,993.16 | 6,632.05 |

Under Section 7429 of the Internal Revenue Code, you are entitled to request administrative and judicial reviews of this assessment action.

For an administrative review, you may file a written protest with the District Director within 30 days from the date of this letter, requesting redetermination of whether or not:

1) the making of the assessment is reasonable under the circumstances, and

2) the amount so assessed or demanded as a result of the action is appropriate under the circumstances.

When feasible, a conference will be held on an expedite basis to consider your protest. Your protest will be forwarded to the Regional Appeals Office where a conference will be held.

If you submit new information or documentation for the first time at an Appeals conference, the Appeals Office may request comment from the District Director on such evidence or documents.

---

17. The plaintiff's assault upon the inclusion by the defendant in the assessment figures of penalties and interest fails for the same reason: plaintiff has not proven that either or both of these add-on categories are inappropriate, the circumstances considered.

Enforced collection action may proceed during any administrative appeal process unless arrangements are made regarding collection of the amount assessed. To make such arrangements, please contact Revenue Officer Richard Pion at telephone number 737–1028.

You may request a judicial review of this assessment by bringing a civil suit against the United States in the U.S. District Court in the judicial district in which you reside, or in which your principal office is located. However, in order to have this action reviewed by the District Court, you must request administrative review within 30 days of the date of this letter. Such suit must be filed within 30 days after the earlier of (1) the day of the Service notifies you of its decision of your protest, or (2) the 16th day after your protest. The Court will make an early determination of the same points raised in your protest to determine whether the making of the assessment is reasonable under the circumstances, and whether the amount assessed or demanded is appropriate under the circumstances. The Court's determination is final and not reviewable by any other court.

*Appeal to the Courts in Case of Income, Estate, Gift and Certain Excise Taxes*

If an agreement is not reached with the Internal Revenue Service, a notice of deficiency is required by law to be issued within 60 days from the date of jeopardy assessment made under Section 6861 of the Internal Revenue Code. You will then have 90 days (150 days if outside the United States) from the date the notice is mailed to file a petition with the United States Tax Court.

> Sincerely,
> /s/ MA Liebermann
> M.A. LIEBERMANN
> District Director

Enclosures:
 Fact Sheet
 Computation

## FACT SHEET

In re: ANTHONY REVIS

Jeopardy Assessment

Revis has departed the United States for Greece, the country of his birth, and has remained there for six months. We have been informed by relatives and the representative of Revis that he would be returning by October, 1982, then Thanksgiving and finally Christmas and he has failed to return to the U.S.

Revis transferred his corporate interest in Corfu, Inc. to his brother, removing the corporate assets from the reach of the government. He furnished a Power of Attorney to his brother to conduct all of his business and sell real estate. Revis has wired funds to a Swiss bank removing a substantial amount of cash from the United States to a location beyond the reach of government authorities.

On November 19, 1982, John Reves effected the sale of a valuable piece of real estate of Revis' as he was empowered to do in an apparent attempt to dissipate the remaining assets of Revis within the reach of the United States government.

**1082**

| (Rev July 1981) | Income Tax Examination Changes | | 10-3 |
|---|---|---|---|

| Name and Address of Taxpayers<br>Fratres + Fetter Revis<br>S5 Floit & Swartz or Ribert L. Rect<br>Salter, Mc Gowan Swartz & Holden, Inc<br>1500 Industrial Bank Building<br>Providence, R.I. 00903 | S S or E I Number<br>04N-44-0102 | | Filing Status<br>Married - Joint |
|---|---|---|---|
| | Person With Whom Examination Changes Were Discussed | Name and Title | |

| 1 Adjustments to Income | Year: 7912 | Year: 8012 | Year: |
|---|---|---|---|
| a Additional Income | 25 825.59 | 52,535.65 | |
| b Exemptions | (4,000.00) | (4,000 00) | |
| c. | | | |
| d | | | |
| e. | | | |
| f | | | |
| g. | | | |
| 2. Total Adjustments | 21 825.59 | 48,535.65 | |
| 3 Adjusted Gross, Taxable or Tax Table Income Shown on Return or as Previously Adjusted | 32,547.92 | 26,916.80 | |
| 4 Corrected Adjusted Gross, Taxable or Tax Table Income | 54,373.51 | 75 452.45 | |
| 5 | 16,921.02 | 28,022.32 | |
| 6. Alternative Tax, If Applicable (From Page _____) | | | |
| 7. Corrected Tax Liability (Lesser of line 5 or 6) | 16,921 02 | 28 022. 32 | |
| 8. Less Credits (Specify) a. | | | |
| b. | | | |
| c | | | |
| 9. Balance (Line 7 less total of lines 8a through 8c) | 16 921 02 | 28,022.32 | |
| 10 Plus a. Tax from recomputing prior year investment credit | | | |
| b. Self-employment tax | 275 40 | | |
| c. | | | |
| 11. Total Corrected Income Tax Liability (Line 9 plus total of lines 10a through 10c) | 17 196.42 | 28 022.32 | |
| 12 il Tax Shown on Return or as Previously Adjusted | 6 036.40 | 4036 00 | |
| 13 Deficiency (Increase in tax before credit adjustments, line 11 less line 12) | 11,160.02 | 23,986 32 | |
| 14. Overassessment (Decrease in tax before credit adjustments, line 12 less line 11) | - 0 - | | |
| 15 Adjustments to Prepayment Credits | - 0 - | | |
| 16 Balance Due (Line 13 or 14 adjusted by line 15, not including interest) | 11,160.02 | 23,986 32 | |
| 17 Overpayment (Line 13 or 14 adjusted by line 15, not including interest) | | | |
| 18 Penalties, if any (See explanation) IAC 6653(b) | 5 580. 01 | 11 993. 16 | |

Other Information

| Examiner's Signature | District | Date |
|---|---|---|
| | | |

Form 4549 A (Rev 7-81)

(93)

**SCHEDULE TC**
**(Form 1040)**
Department of the Treasury
Internal Revenue Service

## Tax Computation Schedule

▶ Attach to Form 1040.

**1980**

Name(s) as shown on Form 1040 *Anthony & Futing Revis*

Your social security number 044 44 0103

### Part I. Computation of Tax for Taxpayers Who Cannot Use the Tax Tables

**Use this part to figure your tax if:**

- Your Income on Form 1040, line 34, is more than $20,000 and you checked Filing Status Box 1, 3, or 4 on Form 1040.

- Your Income on Form 1040, line 34, is more than $40,000 and you checked Filing Status Box 2 or 5 on Form 1040.

- You had more exemptions than were shown in the Tax Table for your filing status.

- You figure your tax using Schedule G (Income Averaging) or Form 4726 (Maximum Tax on Personal Service Income).

| | | | |
|---|---|---|---|
| 1 Enter the amount from Form 1040, line 34 *As Corrected* | 1 | 79452 | 45 |
| 2 Multiply $1,000 by the total number of exemptions claimed on Form 1040, line 7 | 2 | 4000 | 00 |
| 3 Taxable Income. Subtract line 2 from line 1. (Figure your tax on this amount by using the Tax Rate Schedules or one of the other methods listed on line 4.) | 3 | 75452 | 45 |
| 4 Income tax. Enter tax and check if from: ☒ Tax Rate Schedule X, Y, or Z, ☐ Schedule G, or ☐ Form 4726. Also enter on Form 1040, line 35 | 4 | 28082 | 32 |

### Part II. Computation for Certain Taxpayers Who MUST Itemize Deductions

If you are included in one of the groups below, you MUST itemize. If you must itemize and the amount on Schedule A (Form 1040), line 40, is more than your itemized deductions on Schedule A, line 39, you must complete Part II before figuring your tax.

You MUST itemize your deductions if:

A. You can be claimed as a dependent on your parents' return and had interest, dividends, or other unearned income of $1,000 or more and had earned income of less than $2,300 if single (less than $1,700 if married filing a separate return).

Note: If your earned income is more than your itemized deductions, you don't have to fill in Schedule A. Just enter your earned income in Part II, line 3, of this schedule, unless you are married filing a separate return and your spouse itemizes deductions. Generally, your earned income is the total of any amounts on Form 1040, lines 8, 13, and 19. See page 11 of the instructions for Form 1040 for more details.

B. You are married filing a separate return and your spouse itemizes deductions. (There is an exception to this rule. You don't have to itemize if your spouse must itemize only because he or she is described in A and enters earned income instead of itemized deductions on Part II,

line 3, of this schedule. If this is the case, don't complete Part II. Go back to Form 1040, line 33, and enter $0. Then go to Form 1040, line 34.)

C. You file Form 4563 to exclude income from sources in U.S. possessions. (Please, see Form 4563, and Publication 570, Tax Guide for U.S. Citizens Employed in U.S. Possessions, for more details.)

D. You had dual status as a nonresident alien for part of 1980, and during the rest of the year you were either a resident alien, or a U.S. citizen. However, you don't have to itemize if at the end of 1980, you were a nonresident alien married to a U.S. resident or citizen and file a joint return reporting your combined worldwide income.

| | | | |
|---|---|---|---|
| 1 Enter the amount from Form 1040, line 31 | 1 | | |
| 2 If you checked Form 1040, Filing Status Box: {2 or 5, enter $3,400} {1 or 4, enter $2,300} {3, enter $1,700} | 2 | | |
| 3 Enter the amount from Schedule A, line 39 | 3 | | |
| Caution: If you can be claimed as a dependent on your parents' return, see the Note above. Be sure you check the box below line 33 of Form 1040. | | | |
| 4 Subtract line 3 from line 2 | 4 | | |
| 5 Add lines 1 and 4. Enter here and on Form 1040, line 34. (Leave Form 1040, line 33 blank. Disregard the instruction to subtract line 33 from line 32. Follow the rest of the instructions for Form 1040, line 34.) | 5 | | |

The example below may help you to complete Part II.

Example—Walter Green, a single individual, is claimed as a dependent on his parents' return. Walter's adjusted gross income, Form 1040, line 31, is $4,000. Of this amount, $1,500 was earned income from a summer job and $2,500 was unearned income that he received as a beneficiary of a trust. Because Walter is being claimed as a dependent on his parents' return and has unearned income of $1,000 or more and earned income of less than

$2,300, he must use Part II of Schedule TC. Walter knows that his total itemized deductions are only $500. Since this is less than his earned income ($1,500), he does not have to complete Schedule A. Walter enters $2,300, the zero bracket amount for a single individual, on line 2 of Part II and his earned income on line 3. He completes Part II as shown below and enters the total of $4,800 on Form 1040, line 34. He then figures his tax using the Tax Tables as explained in the instructions for lines 34 and 35 on page 12.

| | | |
|---|---|---|
| 1 Adjusted gross income | | $4,000 |
| 2 Zero bracket amount for a single individual | $2,300 | |
| 3 Earned income | 1,500 | |
| 4 Subtract line 3 from line 2 | | 800 |
| 5 Add lines 1 and 4: Enter here and on Form 1040, line 34 | | $4,800 |

Note: If Walter's itemized deductions are more than his earned income, he must complete Schedule A first.

1084

SCHEDULE TC
(Form 1040)

Department of the Treasury
Internal Revenue Service

**Tax Computation Schedule**

▶ Attach to Form 1040.

**1979**

Name(s) as shown on Form 1040 · · · · · · · · · ·

*Anthony + Felice Nevis*

Your social security number

044 44 0103

## Part I — Computation of Tax for Taxpayers Who Cannot Use the Tax Tables

**Use this part to figure your tax if:**

• Your Income on Form 1040, line 34, is more than $20,000 and you checked Filing Status Box 1, 3, or 4 on Form 1040.

• Your Income on Form 1040, line 34, is more than $40,000 and you checked Filing Status Box 2 or 5 on Form 1040.

• You had more exemptions than were shown in the Tax Table for your filing status.

• You figure your tax using Schedule G (Income Averaging) or Form 4726 (Maximum Tax on Personal Service Income).

| | | | |
|---|---|---|---|
| 1 Enter the amount from Form 1040, line 34 *As Corrected* | | 1 | 58,373 51 |
| 2 Multiply $1,000 by the total number of exemptions claimed on Form 1040, line 7 | | 2 | 4000 00 |
| 3 Taxable Income. Subtract line 2 from line 1. (Figure your tax on this amount by using the Tax Rate Schedules or one of the other methods listed on line 4.) | | 3 | 54373 51 |
| 4 Income tax. Enter tax and check if from: ☒ Tax Rate Schedule X, Y, or Z, ☐ Schedule G, or ☐ Form 4726. Also enter on Form 1040, line 35 | | 4 | 16,981 02 |

## Part II — Computation for Certain Taxpayers Who MUST Itemize Deductions

If you are included in one of the groups below, you MUST itemize. If you must itemize and the amount on Schedule A (Form 1040), line 40, is more than your itemized deductions on Schedule A, line 39, you must complete Part II before figuring your tax.

**You MUST itemize your deductions if:**

**A.** You can be claimed as a dependent on your parents' return and had interest, dividends, or other unearned income of $1,000 or more and had earned income of less than $2,300 if single (less than $1,700 if married filing a separate return).

Note: If your earned income is more than your itemized deductions, you don't have to fill in Schedule A. Just enter your earned income in Part II, line 3, of this schedule, unless you are married filing a separate return and your spouse itemizes deductions. Generally, your earned income is the total of any amounts on Form 1040, lines 8, 13, and 19. See page 12 of the instructions for Form 1040 for more details.

**B.** You are married filing a separate return and your spouse itemizes deductions. (There is an exception to this rule. You don't have to itemize if your spouse must itemize only because he or she is described in A and enters earned income instead of itemized deductions on Part II,

line 3, of this schedule. If this is the case, don't complete Part II. Go back to Form 1040, line 33, and enter $0. Then go to Form 1040, line 34.)

**C.** You file Form 4563 to exclude income from sources in U.S. possessions. (Please see Form 4563, and Publication 570, Tax Guide for U.S. Citizens Employed in U.S. Possessions, for more details.)

**D.** You had dual status as a nonresident alien for part of 1979, and during the rest of the year you were either a resident alien or a U.S. citizen. However, you don't have to itemize if at the end of 1979, you were married to a U.S. resident or citizen and file a joint return reporting your combined worldwide income.

| | | | |
|---|---|---|---|
| 1 Enter the amount from Form 1040, line 31 | | 1 | |
| 2 If you checked Form 1040, Filing Status Box: 2 or 5, enter $3,400; 1 or 4, enter $2,300; 3, enter $1,700 | 2 | | |
| | 3 | | |
| 3 Enter the amount from Schedule A, line 39 | | | |
| Caution: If you can be claimed as a dependent on your parents' return, see the Note above. Be sure you check the box below line 33 of Form 1040. | | | |
| 4 Subtract line 3 from line 2 | | 4 | |
| 5 Add lines 1 and 4. Enter here and on Form 1040, line 34. (Leave Form 1040, line 33 blank. Disregard the instruction to subtract line 33 from line 32. Follow the rest of the instructions for Form 1040, line 34.) | | 5 | |

**The example below may help you to complete Part II.**

Example—Walter Green, a single individual, is claimed as a dependent on his parents' return. Walter's adjusted gross income, Form 1040, line 31, is $4,000. Of this amount, $1,500 was earned income from a summer job and $2,500 was unearned income that he received as a beneficiary of a trust. Because Walter is being claimed as a dependent on his parents' return and has unearned income of $1,000 or more and earned income of less than

$2,300, he must use Part II of Schedule TC. Walter knows that his total itemized deductions are only $500. Since this is less than his earned income ($1,500), he does not have to complete Schedule A. Walter enters $2,300, the zero bracket amount for a single individual, on line 2 of Part II and his earned income on line 3. He completes Part II as shown below and enters the total of $4,800 on Form 1040, line 34. He then figures his tax using the Tax Tables as explained in the instructions for lines 34 and 35 on page 12.

| | |
|---|---|
| 1 Adjusted gross income | $4,000 |
| 2 Zero bracket amount for a single individual | $2,300 |
| 3 Earned income | 1,500 |
| 4 Subtract line 3 from line 2 | 800 |
| 5 Add lines 1 and 4. Enter here and on Form 1040, line 34 | $4,800 |

Note: If Walter's itemized deductions are more than his earned income, he must complete Schedule A first.

TC