**GOLDEN ADA, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C 95–4304 MMC.**

United States District Court,
N.D. California.

March 1, 1996.

Robert Lieberman, George D. Niespolo, Sideman & Bancroft, San Francisco, CA, for Golden ADA, Inc.

Tom Carlucci, David Denier, Jay Weill, Assistant United States Attorneys, San Francisco, CA, for the United States.

## MEMORANDUM AND ORDER

THELTON E. HENDERSON, Chief Judge.

### INTRODUCTION

On December 22, 1995, the court heard the petition of plaintiffs Golden ADA, Inc. and its subsidiaries[1] ("Golden ADA") for a determination of the reasonableness of a jeopardy assessment levied against it by the Internal Revenue Service ("IRS") on November 7, 1995. The IRS based its jeopardy assessment on information it gathered as a result of an ongoing investigation into plaintiffs' import/export of rough and polished dia-

monds as well as gold and other precious gemstones from the former Soviet Republic. The IRS relied in large part on pleadings filed with this court in a related action, *The Committee of the Russian Federation of Precious Metals and Gems v. Golden ADA, Inc., et al.*, No. C–95–3449 MMC. Golden ADA contended that the jeopardy assessment was not reasonable because (1) it had stipulated to refrain from transferring, encumbering, or otherwise disposing of its assets until such time as the Honorable Maxine M. Chesney had ruled on the plaintiff's request for a preliminary injunction in No. C–95–3449 MMC, and (2) the IRS was aware of the stipulation and order thereon. Golden ADA further argued that the amount of the jeopardy assessment was not appropriate because the IRS had improperly disallowed its deduction for the cost of goods sold. In short, Golden ADA maintained that it had a cost basis for the gold, diamonds, and jewelry it received from the Committee while the IRS contended that Golden ADA had no cost basis for the goods because they were obtained fraudulently.

On December 29, 1995, the court issued an order notifying the parties that the court had determined that the jeopardy tax assessment and levy made by the IRS was reasonable under the circumstances and that the amount of the assessment was appropriate. The order stated that a complete explanation of the court's decision would be forthcoming.

### BACKGROUND

Golden ADA was formed by Andrei Kozlenok, Ashrot Shagirian, and David Shagirian in October 1992 with the express purpose of processing rough diamonds. Kozlenok was the majority shareholder with 60% of the outstanding shares. The Shagirians transferred their ownership interest to Kozlenok on August 31, 1994.[2] He transferred his

1. The following entities are named plaintiffs in this action and are regarded as subsidiaries of Golden ADA: Shako Energy, Inc.; Shako Air International, Inc.; Golden ADA Calbal, Inc.; Goldbearing, Inc.; Golden ADA Nevada, Inc.; Golden ADA Mfg., Inc.; Shako Air Russia, Inc.; Shako Real Estate Management Co., Inc.; and

Rubin & Son Diamond and Jewelry Supplies USA, Inc.

2. The Shagirians have stated that they did so under extreme duress: Kozlenok allegedly told them that they could either accept $5 million for their shares or "take a bullet to the head."

interest to Rajiv Gosain on or about September 3, 1995.

According to declarations filed in *The Committee of the Russian Federation of Precious Metals and Gems v. Golden ADA, Inc.,* No. C95–3449 MMC, Golden ADA received more than $90 million in gold, polished diamonds, and jewelry from the Committee of the Russian Federation of Precious Metals and Gems ("the Committee") to secure a line of credit on behalf of the Russian Federation in May and June 1993. These goods were not to be sold or transferred. In February and April 1994 Golden ADA received two additional shipments from the Committee consisting of rough diamonds valued at $88 million. These shipments were made pursuant to an agreement between Golden ADA and the Committee that Golden ADA through its various subsidiaries would process the rough diamonds and return them to the Committee. The Committee alleges that Golden ADA neither returned the diamonds nor paid for them despite its repeated demands.[3] The Committee filed a civil RICO action in this court on September 28, 1995 alleging that Golden ADA had converted the gold, diamonds, and jewelry for its own purposes—in particular, for the purchase of luxury automobiles and yachts as well as residential and commercial real property.

Although the Committee sought to enjoin Golden ADA and its subsidiaries from transferring, encumbering, or otherwise disposing of its corporate assets, Judge Chesney did not reach the merits of the issues raised because the parties stipulated to a standstill agreement. The agreement provided, among other things, for the sale of a Gulfstream IV aircraft valued at $17 million subject to certain conditions regarding the use of the sale proceeds. In particular, Judge Chesney permitted Golden ADA to use no more than $1,000,000 of the sale proceeds for the ordinary business expenses of Golden ADA. Judge Chesney directed Golden ADA to provide the Court and the Committee with a full accounting in the event the airplane was sold prior to the hearing on the Committee's request for a preliminary injunction.[4] Judge Chesney entered her order on November 3, 1995.

The filing of the civil RICO action by the Committee prompted the IRS investigation which in turn resulted in the issuance of a jeopardy assessment in the amount of $63,092,111 [5] levied against the corporate assets of Golden ADA on November 7, 1995.

Based on information provided to it by the Committee, the Federal Bureau of Investigation (FBI) began conducting its own investigation into the activities of Golden ADA in January 1995. It discovered that Golden ADA had arranged for the transport of a shipment of gold, polished diamonds, and jewelry from its San Francisco offices to Geneva, Switzerland via Antwerp, Belgium on October 5, 1995. The shipping company (Malca–Amit) produced invoices indicating that the value of the October 5, 1995 shipment exceeded $17 million.[6] On October 25, 1995 the FBI entered the New York offices of Malca–Amit and seized a subsequent shipment of goods from the San Francisco offices of Golden ADA en route to Antwerp, Belgium. The shipment consisted of two cardboard boxes of rough diamonds valued at approximately $400,000.

## DISCUSSION

### A. *Standard of Review*

■ If the collection of income tax will be jeopardized by delay, the IRS is statutorily

---

**3.** Various officers of Golden ADA have acknowledged the debt to the Committee. Golden ADA paid a total of $15 million to the Committee pursuant to an agreed-upon repayment schedule. The last payment was made in December 1994.

**4.** In light of the jeopardy assessment and levy, the parties agreed to continue the hearing on the Committee's request for a preliminary injunction until April 12, 1996. The order as amended remains in effect until that time.

**5.** This sum consists of taxes, penalties, and interest in the amount of $13,183,929 for the tax year

ending September 30, 1993 and $49,908,182 for the tax year ending September 30, 1994.

**6.** On October 18, 1995 a federal grand jury in Los Angeles issued a subpoena directing Malca–Amit to produce the invoices. Rex Decl., Ex. 9, p. 9–13. A letter dated October 20, 1995 from Jay Howell (who is the Controller of Golden ADA) to Gosain indicates that Golden ADA was aware of both the Committee's civil RICO action as well as the grand jury investigation. Rex Supp. Decl., Ex. 10.

authorized to expedite its collection by immediate levy on a taxpayer's property through the use of a jeopardy assessment. 26 U.S.C. §§ 6861 and 6862; *Burd v. United States,* 774 F.Supp. 903, 905 (D.N.J.1991). Regulations promulgated by the United States Treasury Department provide that a jeopardy assessment is appropriate when one of the following conditions is present:

(1) the taxpayer is or appears to be designing quickly to depart from the United States to conceal himself;

(2) the taxpayer is or appears to be designing quickly to place his property beyond the reach of the government by removing it from the United States, or by concealing it, or by transferring it to another person, or by dissipating it; or

(3) the taxpayer's financial solvency appears to be imperiled.

26 C.F.R. 1.6851–1(a)(1).

Judicial review of a jeopardy assessment is limited to a de novo determination of whether the jeopardy assessment was reasonable under the circumstances and whether the amount assessed was appropriate. 26 U.S.C. § 7429(b). If the court determines that the assessment is unreasonable, or the amount inappropriate, the court may order abatement, the redetermination of the assessment, or other such action as the court deems appropriate. 26 U.S.C. § 7429(b)(3). The district court's decision is not reviewable. 26 U.S.C. § 7429(f).

■ The government has the burden of proving by a preponderance of the evidence that the jeopardy assessment is reasonable while the taxpayer bears the burden of proving the inappropriateness of the amount assessed. 26 U.S.C. § 7429(g). The court finds that the IRS has presented sufficient evidence to meet its burden of proving that the jeopardy assessment was reasonable and that Golden ADA is unable to discharge its burden of proving that the amount of the assessment is inappropriate under the circumstances.

**B. *Reasonableness of the Jeopardy Assessment***

■ In determining the reasonableness of the government action, the court is not limited to consideration of the information available to the IRS at the time of the assessment but must also consider any subsequently available information that might affect the reasonableness of the jeopardy assessment. "[A]ny relevant information should be considered." *Loretto v. United States,* 440 F.Supp. 1168, 1172 (E.D.Pa.1977); *see Stebco, Inc. v. United States,* 733 F.Supp. 1387, 1391 (S.D.Cal.1990), *appeal dismissed,* 916 F.2d 556 (9th Cir.1990); *Revis v. United States,* 558 F.Supp. 1071, 1077 (D.R.I.1983); *Haskin v. United States,* 444 F.Supp. 299, 304 (C.D.Cal.1977). In addition, the court may evaluate evidence that would normally be inadmissible under the Federal Rules of Evidence. *Harvey v. United States,* 730 F.Supp. 1097, 1104 (S.D.Fla.1990).

■ Although the "reasonable under the circumstances" test is imprecise by nature, the general rule is that a jeopardy assessment is "reasonable" so long as the decision to impose it falls between "something more than 'not arbitrary and capricious' and something less than 'supported by substantial evidence.'" *Garcia v. United States,* 714 F.Supp. 1036, 1037 (N.D.Cal.1989); *McAvoy v. Internal Revenue Service,* 475 F.Supp. 297, 299 (W.D.Mich.1979); *Loretto,* 440 F.Supp. at 1172.

Here, the government contends that Golden ADA had the capacity and likely intent to place its assets beyond the reach of the IRS and that its financial solvency appeared to be imperiled. Considering all of the evidence available to date, the court concludes that the jeopardy assessment made by the IRS on November 7, 1995 was reasonable under the circumstances.

**1. *Liquidation and Removal of Corporate Assets***

Since March 1995 Golden ADA sold or transferred real property located in San Mateo County for more than $2.85 million. Sotomayor Decl., ¶ 4; Koenig Decl., ¶ 3. Since April 1995 Golden ADA also sold or transferred three boats valued in excess of $800,-000. Koenig Decl., ¶ 4.

The managed investment account held in the name of Golden ADA at Bank of California had a market value of $1.2 million as of January 1, 1995. Its market value as of November 16, 1995 is $2,930.39. The account summary reflects significant sums of money deposited to and then transferred from the account. King Decl., Ex. C.

Golden ADA argues that the liquidation of its corporate assets occurred prior to Gosain's purchase of Golden ADA from Kozlenok on September 3, 1995 and that Gosain is attempting to preserve the integrity of its corporate assets. Yet since the filing of the civil RICO action by the Committee on September 28, 1995, Golden ADA has engaged in a number of transactions that give rise to the inference that Golden ADA intended to place its assets beyond the reach of the IRS.

First, on October 5, 1995 Golden ADA arranged for the transport of $17 million in polished diamonds, gold, and jewelry to Geneva, Switzerland—80% of its remaining inventory.[7] King Decl., ¶ 5. On October 25, 1995 the FBI intercepted a second shipment of diamonds also with an intended destination of Geneva, Switzerland. Affidavit of Special Agent Daniel Haser, Rex Decl., Ex. 9.

Second, on October 3, 1995 Shako Real Estate Management received a check in the amount of $754,958.45 for the sale of real property located at 365 Broadway in Millbrae, CA. King Decl., ¶ 14. On October 8, 1995 Golden ADA transferred $600,000 of the sale proceeds to a bank account in Antwerp, Belgium.[8] King Decl., ¶ 15.

Third, two Aston–Martin automobiles registered in the name of Golden ADA cannot be located.[9] Until November 8, 1995 the automobiles were parked in spaces reserved for Gosain in the residential building where he owns a condominium. Koenig Decl., ¶ 16.

Fourth, on October 16, 1995 Golden ADA removed furnishings, antiques, and certain artwork from two homes in Lafayette, CA and transported them to a storage facility in San Francisco, CA. Koenig Decl., ¶ 13. The same goods were later moved to another storage facility in San Francisco, CA.[10] Koenig Decl., ¶ 13.

Fifth, on November 9, 1995 Golden ADA directed that the cash receipts from the two gas stations owned by Shako Energy be delivered to its San Francisco offices. Koenig Decl., ¶ 15.

These facts support the conclusion that Golden ADA was capable of and willing to avoid the payment of taxes by any method. Whether Golden ADA in fact intended to liquidate its assets and place them beyond the reach of the IRS thereby avoiding payment of its taxes is irrelevant. It is the appearance of such things that is relevant and controlling. *See Revis v. United States,* 558 F.Supp. at 1077. Thus, the government has sustained its burden of proving that its issuance of the jeopardy assessment in question was reasonable under the circumstances by showing that (1) a substantial amount is owed; (2) the taxpayer was made aware that it was the subject of a criminal investigation as well as a civil RICO action after which it continued to liquidate its assets; (3) it was told by its accountant that a substantial tax would be owed for the 1994 tax year; (4) it sold properties but offered to pay no part of the proceeds to either the government or the Committee; and (5) the form and whereabouts of other assets, including sale proceeds, is either currently unknown or beyond the reach of the IRS.

### 2. *Financial Insolvency*

The IRS has also presented sufficient evidence to establish that Golden ADA's finan-

---

**7.** Golden ADA claims that the diamonds were shipped to Switzerland for valuation purposes only and will be returned. No explanation is provided as to why the valuation could not be obtained in the United States.

**8.** The IRS has not provided the Court with a translation of the document attached as Exhibit D to the declaration of David King that the government produced as evidence of the wire transfer.

**9.** One of the automobiles is a 1993 Aston Virage purchased on March 14, 1994 for $336,618.48. Rex Decl., Ex. 5, p. 5–33.

**10.** The IRS seized the goods on November 17, 1995, pursuant to an Order to Enter the Premises issued by the Honorable Fern Smith. Koenig Decl., Ex. 3.

cial condition is precarious at best. First, an unaudited balance sheet dated September 30, 1995 and offered in support of its position that Golden ADA is financially viable fails to reflect the sale of real and personal property noted above. Complaint, Ex. E. Furthermore, the inventory and cash reserves listed are no longer in the United States.

Second, in a letter dated June 15, 1995 James Cegelski of the accounting firm Arthur Andersen informed the Chief Executive Officer of Golden ADA that

> [b]ased on Golden ADA's cash projections, cash balances have fallen from $11.3 million as of April 1 to $4.5 million as of May 31, 1995. At this rate, cash resources are expected to be exhausted within the next three months ... Without immediate action towards implementing these recommendations, we feel that Golden ADA is not a viable entity.

Rex Decl., Ex. 5, p. 5–6, 5–7 (emphasis in original).

Third, the IRS obtained copies of a letter dated October 20, 1995 from Jay Howell [11] to Gosain recommending that Golden ADA file for bankruptcy protection under Chapter 11. Rex Supp. Decl., Ex. 10. An unsigned letter dated November 17, 1995 from Gosain to the Committee indicates that Golden ADA was prepared to file such a petition no later than November 22, 1995 if it was unable to reach a compromise with the Committee regarding its debt. Rex Supp. Decl., Ex. 11. Golden ADA maintains that its willingness to seek bankruptcy protection lends credibility to its professed intention to continue its operations subject to a reorganization plan approved by its creditors. While it is true that a number of corporations emerge from bankruptcy intact, the prospective filing of a bankruptcy petition is not a leading indicator of financial solvency. Fourth, the IRS recovered more than $100,000 in cashier's checks when its agents entered the San Francisco offices of Golden ADA on November 7, 1995. The cashier's checks were intended to meet Golden ADA's payroll obligations. Koenig Decl., ¶ 7. Bank records reveal that Golden ADA purchased a large number of cashier's checks to pay such incidental office expenses as janitorial services. Koenig Decl., ¶ 8.

11. Howell is the Controller of Golden ADA.

These facts support the conclusion that the financial solvency of Golden ADA appeared to be imperiled. Thus, the government has sustained its burden of proving that the issuance of the jeopardy assessment was reasonable under the circumstances.

### C. *Reasonableness of the Amount Assessed*

The second issue the court must determine is whether the amount assessed was reasonable under the circumstances. As noted above, the taxpayer has the burden of proving that the amount assessed under section 6861 is not "appropriate under the circumstances." 26 U.S.C. § 7429(g)(2). The amount assessed is presumed to be reasonable. *Revis,* 558 F.Supp. at 1078. The mere existence of a factual dispute does not invalidate the assessment. *Hecht v. United States,* 609 F.Supp. 264, 266 (S.D.N.Y.1985). Such challenges are matters more properly resolved before the Tax Court, or, upon payment of the tax, in a refund action brought in United States District Court. *Vanerio v. Internal Revenue Service,* 629 F.Supp. 1141, 1145 (E.D.N.Y.1986).

Here, the IRS calculated the amount of the jeopardy assessment by disallowing the deduction taken by Golden ADA for the cost of goods sold in each tax year, resulting in taxable income of $29,968,716 for the tax year ending September 30, 1993 and $111,485,984 for the tax year ending September 30, 1994. The government determined that if the Committee's allegations were true, Golden ADA did not have a cost basis for the diamonds sold. The court cannot find that the amount of the assessment is inappropriate because Golden ADA has presented no evidence to rebut the presumption of reasonableness.

### CONCLUSION

For the foregoing reasons, the jeopardy assessment is found to be reasonable under the circumstances and is sustained.

**IT IS SO ORDERED.**