Edward P. VARJABEDIAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CIV.A.03–10796–JGD.

United States District Court, D. Massachusetts.

Aug. 26, 2004.

George F. Gormley, Gormley & Colucci, P.C., Boston, MA, for Plaintiff.

Lori J. Holik, United States Attorney's Office John Joseph Moakley Federal, Courthouse, Boston, MA, for Defendant.

*FINDINGS OF FACT AND RULINGS OF LAW AFTER BENCH TRIAL ON PLAINTIFF'S CHALLENGE TO JEOPARDY ASSESSMENT*

DEIN, United States Magistrate Judge

## I. INTRODUCTION

Plaintiff, Edward Paul Varjabedian ("Varjabedian"), filed this action pursuant to 26 U.S.C. § 7429(b) seeking judicial review of a jeopardy assessment conducted by the Internal Revenue Service (the "IRS" or "government") in December, 2002 for the income tax years 1997–2000 and the employment tax years 1999–2001. Varjabedian challenges both the IRS' decision to initiate the jeopardy proceeding in the first place as well as the amount assessed against him thereafter. On February 10, 2004, this court held a bench trial limited to these two issues. While the parties agree on the underlying amounts at issue, they dispute the methods of calculation to be applied to those figures. Having reviewed the evidence and the parties' post-trial memoranda (Docket ## 20, 21), this court makes the findings of fact and rulings of law detailed below. This court concludes that the imposition of the jeopardy assessment was reasonable under the circumstances and that the amount assessed was appropriate. Consequently, judgment shall enter in favor of the defendant.

## II. STANDARD OF REVIEW

■ "If the collection of income tax will be jeopardized by delay, the IRS is statutorily authorized to expedite collection by immediate levy, via a jeopardy assessment, upon a taxpayers' property." *Olbres v. Internal Revenue Serv.*, 837 F.Supp. 20, 21 (D.N.H.1993) (citing, *inter alia*, 26 U.S.C. § 6861). The effect of a jeopardy proceeding "is to render these taxes immediately due and payable, so that the IRS can act to insure collection." *Rey Balaguer v. United States*, 656 F.Supp. 383, 385 (D.P.R.1987). However, the jeopardy proceeding "is of a summary nature and does not amount to a final determination of plaintiff's correct tax liability." *Id.*

■ "The taxpayer is first entitled to an administrative review of the reasonableness of the jeopardy actions" after which "the taxpayer may challenge the reasonableness of the jeopardy assessment and levy in a district court." *Wellek v. United States*, 324 F.Supp.2d 905, 910 (N.D.Ill. 2004). The court's review "is limited to determining (1) whether making the assessment and levy is reasonable under the circumstances, and (2) whether the amount assessed is appropriate under the circumstances." *Id.; accord* 26 U.S.C. § 7429(b)(3)(A). In cases brought under § 7429(b), "[t]he government bears the burden of proving the reasonableness of the assessment, while the taxpayer bears the burden of proving the inappropriateness of the amount assessed." *Olbres v. Internal Revenue Serv.*, 837 F.Supp. at 21; *accord* 26 U.S.C. § 7429(g). " 'Reasonable under the circumstances' means something more than 'not arbitrary or capricious' and something less than 'supported by substantial evidence.' " *Wellek v. United States*, at 911 (internal citation and quotation omitted).

■ Due to the summary nature of the judicial proceeding, the court "can hear evidence that may be inadmissible in a trial on the merits." *Id.* Similarly, "[i]n determining whether the assessment is reasonable and the amount assessed is appropriate, the Court is to take into account not only information available to the Internal Revenue Service on the assessment date, but also any other information which bears on the issues before it." *Guillaume v. Commissioner*, 290 F.Supp.2d 1349,

1353 (S.D.Fla.2003) (internal citation and quotation omitted). If the court finds that either the government's imposition of the assessment was unreasonable or that the amount assessed or demanded is inappropriate, the court may order the Secretary "to abate such assessment" or to "redetermine (in whole or in part) the amount assessed or demanded, or to take such other action as the court finds appropriate." 26 U.S.C. § 7429(b)(4). The district court's determination is final and may not be reviewed by any other court. *See Wellek v. United States*, at 910; *see also* 26 U.S.C. § 7429(f). Applying these principles to the instant case, the court makes the following findings of fact and rulings of law.

### III. *FINDINGS OF FACT*

1. Varjabedian operated a gas station called Ed's West Harwich Sunoco (the "Sunoco Station") in West Harwich, Massachusetts during the years 1997 through 2001. (Stipulation (Joint Pretrial Statement) (Docket # 18) at 5; *e.g.*, Ex. 30 at 4). He continues to do so today.

#### *The Events Leading to the Jeopardy Assessment*

2. In or about November of 2001, IRS Special Agent Charles Blackmore ("Agent Blackmore") received information from a United States Postal Service ("USPS") inspector that a company called Garber Brothers was receiving a large number of postal money orders, which were being purchased in blocks of four at a

number of post offices in Cape Cod. (Bench Trial Transcript ("Tr.") (Docket # 19) at 13, 50).

3. The purchases were being made by Varjabedian and/or West Harwich Sunoco. (Tr. at 14). They were being made primarily at the Yarmouthport, Dennis, East Dennis, Dennisport, South Dennis, and West Harwich post office branches. (Tr. at 51). Each of these locations is within close proximity to either Varjabedian's home or the Sunoco Station. (Tr. at 51–52).

4. Varjabedian was purchasing the postal money orders in a manner which allowed him to stay just under $3,000. (Tr. at 13–14). This pattern raised the inspector's suspicion since, at the time, federal law mandated that the USPS report any purchases of money orders by one individual within one day that exceeded $3,000 in the aggregate. When such a purchase was made, the USPS was required to obtain and report, *inter alia*, the purchaser's name, social security number, and address. (Tr. at 14, 52–55).[1]

5. Upon investigation, Agent Blackmore learned that Varjabedian had been purchasing postal money orders in this manner since at least 1994 and had done so from a number of post offices in the area. (Tr. at 14).

6. In connection with the IRS' investigation, Agent Blackmore then talked to various postal employees at the post offices where the purchases had

---

1. At trial, and in order to dispel any inference that Varjabedian was attempting to evade reporting requirements, Varjabedian's counsel asserted that the post office had an internal policy whereby it generated a Funds Transaction Report for any purchases of

money orders exceeding $1,000. (Tr. at 53–54). However, that policy applies only to cash purchases of wire transfers and stored value cards, not money orders which are at issue in the instant case. (*See generally* Ex. 61).

occurred. (Tr. at 14–15). Several of these individuals remembered having conversations and/or interactions with Varjabedian. Most notably, one employee remembered Varjabedian being upset when he learned that a report had to be filed since he had exceeded the $3,000 limit. Another employee, who is also Varjabedian's neighbor, recalled that Varjabedian had asked to be notified if the $3,000 limit ever increased. (Tr. at 15).

7. Upon further investigation, Agent Blackmore discovered that Varjabedian had two business accounts at Garber Brothers by which he purchased cigarettes, aspirin, pharmaceuticals, and other small grocery products. (Tr. at 15–16). One account, No. 8926, was called the "West Harwich Sunoco" account (the "Sunoco Account") and the other account, No. 8918, was called "West Harwich Sunoco, Miscellaneous" (the "Miscellaneous Account"). (Tr. at 16; Ex. 34). Originally, Varjabedian wanted to name the West Harwich Miscellaneous Account simply "Miscellaneous," but Garber Brothers refused his request. (Tr. at 16).

8. In combination, the USPS' records and Garber Brothers' records indicated that from approximately 1994 through June of 2002, Varjabedian made approximately $120,000 in purchases on the Sunoco Account, which he paid for with official West Harwich Sunoco checks. (Tr. at 16). In addition, Varjabedian purchased about $2.8 million [2] in goods, mostly cigarettes, on the Miscellaneous Ac-

count. (Tr. at 16–17). He paid for the Miscellaneous Account's purchases exclusively with postal money orders. (Tr. at 16).

### The Search of Varjabedian's Residence

9. After the IRS concluded its investigation at Garber Brothers, it then obtained and executed a search warrant at Varjabedian's residence in Dennis, Massachusetts to search for business records. (Tr. at 17–18; cf. Ex. 44).[3]

10. Varjabedian was present during the search, which took place on or about June 26, 2002. At that time, IRS agents found many documents relating to Varjabedian's personal assets and business dealings. (E.g., Exs. 1–22; Tr. at 18, 38–39). These included several documents which indicated that Varjabedian's sister, Diana Varjabedian ("Diana"), was holding assets in her name, which belonged to Varjabedian. It is undisputed that there were substantial assets belonging to Varjabedian that were held in his sister's name. (Tr. at 207).

11. The documents located during the search included the following:

   (a) A typed note from Diana dated November 3, 1997 and revised on November 17, 1997 informing Varjabedian that she had deposited $20,000 into her checking account at BankBoston from Varjabedian's money market account and had also opened a money market account there in her name only, but for which Varjabedian would receive a monthly statement. She

---

**2.** Garber Brothers' records reflect a greater sum spent by Varjabedian than the USPS' records since the IRS was unable to find all of the postal money orders. (Tr. at 17).

**3.** The Sunoco Station was not searched at any point. (Tr. at 39).

enclosed all the registers and checks she had received for the money market account, made them payable to Varjabedian, and signed them for him to use as needed in order to deposit money into his own account. (Ex. 3; Tr. at 19–20).[4]

(b) A memorandum from Diana dated November 17, 1997 detailing the maturation of six certificates of deposit ("CDs") at the Cape Cod Cooperative Bank. She informed Varjabedian that she had enclosed six signed withdrawal authorization forms for him "so that you have control of your CDs at Cape Cod Cooperative Bank." The document also referred to signed BankBoston Money Market checks she had given him so that he could "access your money when you need it." In addition, Diana advised Varjabedian that "if you take the money and run away, spend it all at once, so there won't be any left when they find you!" (Tr. at 20–21; Ex. 5).

(c) A December 1, 1997 letter from Diana to Varjabedian along with the original Certificates of Title for four antique vehicles he had transferred to her on November 7, 1997. The transfers made Diana the owner of record for each one. She also gave him instructions for transferring the vehicles back to himself in the event she died, and she had already signed the back of each Certificate for that purpose. Diana concluded by stating "[m]y intent is that these vehicles not be part of my estate as they were originally purchased by you and were transferred to me on a temporary basis only. **No one other than you** should have access to these assets .... Happy motoring!" (Tr. at 27–28; Ex. 17) (emphasis in original). Agent Blackmore saw three of these vehicles at Varjabedian's residence. (Tr. at 28).

(d) A letter dated January 10, 1998 from Diana to Deborah Booth at the Cape Cod Cooperative Bank setting up a Super Savings Account in her name, but in trust for Varjabedian. Diana was funding the account with the proceeds from six CDs, and noted that she had been unable to find the passbooks for those CDs. Varjabedian, who had been copied on the letter, made handwritten notes on the document indicating that he, in fact, had possession of at least one of those passbooks. (Ex. 6; Tr. at 21).

(e) Another copy of the same January 10, 1998 letter, but with Diana's addition of a handwritten note dated June 3, 1998 informing Varjabedian that "all 6 of your CD's matured and all the funds are now in your Cape Cod Coop. Super

---

4. At trial, Varjabedian's counsel implied that it was unreasonable for the IRS to rely on the documents purportedly signed by Diana since the handwriting exemplar which confirmed her identity as the signatory on the documents did not occur until after the jeopardy assessment had commenced. (Tr. at 61–63). However, the agent could make his own determination that it was Diana's handwriting without expert analysis. (*See* Tr. at 62). Also, since the documents did, in fact, turn out to be signed by Diana and since, as stated above, the court can consider later events in evaluating the reasonableness of the assessment, it is irrelevant that the IRS may not have conclusively known Diana was the signatory at the time.

Savers Acct. . . . which is set up in my name in trust for you." She also noted that she had enclosed all Varjabedian's cancelled passbooks for his records. (Tr. at 22; Ex. 7).

(f) An August 6, 1998 letter from Diana to Varjabedian notifying him that she had closed out the Cape Cod Cooperative Super Savings account and deposited the full amount into a Cape Cod Five Cents Savings Bank money market account, and that she had also opened safe deposit box No. 370 there as well. According to Diana, she opened the account in her name, and not in trust for Varjabedian, to avoid giving the bank his social security number. (Tr. at 22–24; Ex. 8). Nevertheless, Varjabedian was to have full access to the money. (Ex. 8). Agents also found the slips for these transactions amongst Varjabedian's records, as well as a bank statement dated September 5, 1998, on which Diana's name was crossed out and replaced by "ED'S ACCT." (Exs. 10–12, 16; Tr. at 24–25, 27).

(g) Correspondence indicating that Diana had opened two safe deposit boxes for Varjabedian, one at BankBoston and one at Cape Cod Five Cents Savings Bank. (Exs. 8, 9). Instructions for him to gain access to the boxes and locate the keys were given as well. (Ex. 8; Tr. at 23).

(h) Three Durable Powers of Attorney allowing Varjabedian to access and remove the contents from the safe deposit boxes at BankBoston in Yarmouthport (dated 11/4/97) [5] and at the Cape Cod Five Cents Savings Bank in Harwichport (dated 8/6/98). (Tr. at 20, 26–27; Exs. 4, 14).

(i) An August 21, 1998 note from Diana to Varjabedian which stated that a Cape Cod Five Cents Savings Bank representative had told her that if she "put accts in trust for another person, they would require that person's social sec. no. and 'it could come up in a search by the IRS but supposedly they can't access the funds unless I am deceased and you have the money . . . but whose to say—there are no guarantees.' So, I'm not making you trustee on any accts. If I die you better race around to all the banks before you call [the funeral home]." (Ex. 13; Tr. at 25–26).

(j) A February 20, 2002 faxed note from Varjabedian to Diana informing her that he would be "taking van out of your name today or first of week" and that he would "eventually fax transfer paper of ownership on van for your records." (Ex. 18; Tr. at 28–29).

(k) An undated note written by Varjabedian which had "IRS" written on the top and stated that "(1) unusual [sic] large deductions relative to income will trigger IRS audit. (2) With middle class tax payers [sic] if itemized deductions exceed 44% of adjusted gross income you enter the audit danger zone. The IRS commissioner says if you have unusual [sic] high expenses you should write an explanation and include it with your tax form." (Ex. 19; Tr. at 29).

---

5. The third Durable Power of Attorney (Ex. 15) was for the BankBoston box, and was executed to reflect the corporate change after Fleet Bank took over. (Tr. at 27).

(*l*) An undated letter from Varjabedian to an employee apparently written in response to the employee's "threat of IRS[.]" (Ex. 20). Varjabedian wrote that since the employee voiced a threat, Varjabedian could "only assume you had thought of it before and that tells me your [sic] not happy at your job. If you are not happy then maybe you need a change. i[sic] will give you 1 week vacation 1 week severance + will give you a great reference when you find a new possibility of a job. I will be willing to go to the business + talk to the owner to boost your chances. You are also welcome to use my shop ... and lifts any time you want if you decide to leave and i[sic] mean that because if you or family [sic] need a tow call me at home + i[sic] will give you a special rate[.]" (Ex. 20; Tr. at 29–31).

(m) Two undated typed notes from Diana to Varjabedian. One note gave him instructions on how to get into her house to obtain passbooks to unspecified accounts and included six withdrawal authorization forms "signed and witnessed so that you have control of your money." Diana concluded the note by telling Varjabedian "[m]y only advise [sic] is, if you take the money and run away, spend it all at once, so there won't be any left when they find you!" (Ex. 21; Tr. at 31).

(n) The other note stated "IF I SHOULD DIE, THE FIRST THING YOU SHOULD DO IS RUN, DON'T WALK, TO BANK-BOSTON AND CAPE COD COOP. AND WITHDRAW ALL FUNDS AND REDEPOSIT THEM IN AN ACCT. IN YOUR NAME ONLY." (Ex. 22; Tr. at 31–32) (capitalization in original).

(o) Handwritten employee wage payment records which depicted the number of hours each employee worked and earned per week from approximately January, 1999 through December, 2001. (Ex. 49; Tr. at 38, 72–73). At some point after the execution of the warrants, agents spoke to two of Varjabedian's employees who confirmed that they did, in fact, receive some or all of their wages under the table. (Tr. at 37).

(p) Agent Blackmore considered all of the documents described above before recommending that the IRS commence the jeopardy assessment. (Tr. at 18–32).

12. In addition to the documents identified above, during the search the agents also located an apparent "trial balance" for the Sunoco Station as of December 31, 2000 detailing the Station's expenses and showing, *inter alia,* the gross sales income Varjabedian received for certain items and services, as well as the cost of goods sold. (Ex. 33; Tr. at 38).

13. In addition, agents discovered handwritten records which seemed to detail weekly cigarette sales from December 25, 1996 until June 28, 2000. The records, depicted in chart form, listed the week's starting date, the number of cartons purchased by Varjabedian, the number of packs or cartons sold, the price markup over cost per pack or carton, and the total profit for the week. The records indicate that the markup varied over time from 14% to 19% above cost. (Exs. 48, 53; Tr. at 73–74, 134–36). As

detailed below, while the parties agree on the amount of sales, they disagree as to the appropriate markup.

14. To date in the investigation, the IRS has not found any original source documents, such as cash register receipts or tapes, to verify the accuracy of Varjabedian's hand-written cigarette sales records. (Tr. at 81–82, 96–97).

### The Searches at the Banks

15. After locating the keys and correspondence referencing safe deposit boxes, that same day the IRS agents attempted to access the boxes at Fleet Bank and Cape Cod Five Cents Savings Bank, but could not obtain search warrants before the banks closed. (Tr. at 32–33).

16. After obtaining the necessary warrants, the agents went to the banks the next day. The two agents executing the warrants went to the Cape Cod Five Cents Savings Bank in Harwichport first, and arrived before the bank opened. Once the bank opened, the agents began serving the warrant. While they were doing so, Varjabedian entered the bank and went directly to the safe deposit box area in an apparent attempt to access his box. The agents approached Varjabedian and explained that they had a warrant and that he could not access his box at that time. (Tr. at 33).

17. Because the keys the agents had found at Varjabedian's residence turned out not to be the correct keys for the boxes, the agents informed Varjabedian that it would be necessary to drill the box unless he consented to give them the key.

Varjabedian refused to do so and left the bank. (Tr. at 33–34).

18. The agents followed Varjabedian outside and told him that they also had a search warrant for the Fleet Bank in Yarmouth and that he was not to go there either. (Tr. at 34).

19. Leaving Agent Blackmore at the Cape Cod Five Cents Savings Bank to wait for the locksmith, other agents went to the Fleet Bank in Yarmouth. Upon arrival, they were informed that Varjabedian had already been there before the bank opened and had tried to access his box but was too early. (Tr. at 34). While the agents were at the bank, Varjabedian came to the bank again and tried to access his box. The agents reiterated that they had a search warrant. (Tr. at 34–35).

20. After the Fleet Bank box was drilled, two agents and two bank officials searched it and found 20 white envelopes with "West Harwich Sunoco" written on them. There was a total of $10,000 in each envelope, all in $100 bills, except for two $50 bills, for a total of $200,000. (Tr. at 35–37; Ex. 25).

21. After the box at the Cape Cod Five Cents Savings Bank was drilled, two agents and two bank employees searched the box and discovered $135,000 packaged like the contents of the other box. (Tr. at 35–36; Exs. 23–24).

### Agent Blackmore's Spreadsheets

22. Based on the records found at Varjabedian's residence, Agent Blackmore compiled at least two Excel spreadsheets. One spreadsheet details the total amount of unreported employee wages from 1999–2001 by

comparing the amount of wages reflected on the W–2s with the total amount of wages reflected in Varjabedian's handwritten records. In addition to summarizing the amount of unreported wages, Agent Blackmore's spreadsheet also details the amount each employee earned on a weekly basis throughout the relevant time-period. (Ex. 36; Tr. at 38).

23. Agent Blackmore did not actually make any employment tax computations. His role was limited to simply taking the numbers from the records and putting them "in the spreadsheet and summariz[ing] all of them ... I just made it a little bit easier to see the final numbers." (Tr. at 73).

24. Agent Blackmore's other spreadsheet details the amount of cigarettes Varjabedian purchased from Garber Brothers on each account from January, 1997 through December, 2000 based on the information obtained from Garber Brothers' records. The chart summarizes the purchase price for the shipment, Garber Brothers' suggested retail price, and the corresponding projected net profit. (Tr. at 38, 90–92; Ex. 34).

25. As for the unreported cigarette sales, Agent Blackmore tried to confirm the calculations depicted in Varjabedian's handwritten records, although he did so after the jeopardy assessment had been initiated. Agent Blackmore testified that he compiled an additional, third, spreadsheet for these figures, however, that document was not offered as an exhibit and is not before the court. (Tr. at 82–84).

### The Commencement of the Jeopardy Assessment

26. Based on his investigation, Agent Blackmore recommended that the IRS commence a jeopardy assessment against Varjabedian. Thereafter, in late November 2002, Varjabedian's case was assigned to Agent Joseph Guidoboni ("Agent Guidoboni"), a member of the IRS' Special Enforcement Program group. (Tr. at 86–87, 104).

27. Agent Guidoboni's task was to compute Varjabedian's income tax liabilities for 1997 through 2000 and to compute his employment tax liabilities for 1999 through 2001. He was not asked to calculate Varjabedian's income tax liability for 2001. (Tr. at 87).

28. Agent Guidoboni completed his calculations by mid-December of 2002. (Tr. at 105). Then, on December 20, 2002, the IRS sent two Notices of Jeopardy Assessment and Right of Appeal to Varjabedian. The IRS' Area Director found that Varjabedian "may be designing to quickly place your property beyond the reach of the Government and that your financial solvency appears to be imperiled." Consequently, the Area Director concluded that the collection of Varjabedian's employment tax for 1999–2001 (Ex. 39) and income tax for 1997–2001 [6] (Ex. 40) were jeopardized.

---

**6.** Agent Guidoboni was only instructed to calculate Varjabedian's income tax liability for 1997–2000 despite the fact that the Area Director found that such tax was also imperilled for 2001.

29. The Notices relied on the following facts to justify the assessment:

   a) You have opened at least one bank account in the name of Diana Varjabedian, your sister, in order to hide the fact that the funds in question where [sic] yours.

   b) Diana Varjabedian rented two separate safe deposit boxes in her name without disclosing your name or social security number.

   c) You attempted to remove $335,000.00 in cash from the safe deposit boxes despite your knowledge that search warrants were being executed. (Exs. 39, 40).

The Notice regarding the employment tax also listed the fact that Varjabedian's "handwritten payroll records did not reconcile with the Forms W–2 issued to your employees." (Ex. 39).

### Unreported Wages—Employment Tax Liability

30. Based on Varjabedian's handwritten wage payment records (Ex. 49) as reflected in Agent Blackmore's spreadsheet (Ex. 36), Agent Guidoboni concluded that Varjabedian had under-reported his wages for 1999, 2000, and 2001, and thus, that the proper amount of employment tax had not been withheld from the employees' paychecks. (Tr. at 97–102).

31. The parties have stipulated as to the amount of unreported wages. However, the parties disagree on the appropriate rate to be applied to determine Varjabedian's tax liability. (Stip. at 5–6; Tr. at 98–99, 148–49).

32. To calculate Varjabedian's estimated eventual employment tax liability, Agent Guidoboni applied a rate of 28% to the unreported wages paid in each year since "any time there is an employment tax case, here for unreported wages, we're proscribed [sic] by the Internal Revenue manual [sic] to use 28 percent for an income tax withholding figure." (Tr. at 100). In so concluding, Agent Guidoboni relied on § 4.23.8.8(1) & (2) (Ex. 37) and § 4.23.8.4 (Ex. 38) of the Internal Revenue Manual (the "IRM"). (Tr. at 102–03, 111, 114, 117–18).

33. Applying the 28% rate, and treating the wages as having been paid in the fourth quarter of each year, Agent Guidoboni made the following calculations, as reflected in Ex. 35:

| Year | Unreported Wages | Total Income Tax Withholding (at 28%) | Total Social Sec. & Medicare Tax (at 15.3%) [7] | Penalties | Total Owed |
|------|------------------|---------------------------------------|------------------------------------------------|-----------|------------|
| 1999 | $ 88,102 | $24,669 | $13,480 | $ 8,304 | $ 46,453 |
| 2000 | $102,676 | $28,749 | $15,709 | $ 9,677 | $ 54,135 |
| 2001 | $134,238 | $37,587 | $20,538 | $12,652 | $ 70,777 |
| T | $325,016 | $91,005 | $49,727 | $30,633 | $171,365 |

34. The Notice sent to Varjabedian reflected the figures determined by

---

7. The amount of the social security and medicare contributions are not disputed. (Tr. at 148–49; Ex. 58).

Agent Guidoboni. (Ex. 39).

35. Varjabedian submitted the testimony of George Norton, a tax practitioner representative. Mr. Norton testified that the appropriate rate would be 15%. (Tr. at 149). He based this conclusion on the taxpayer's handwritten records which showed that taxes were paid on a weekly basis and that the total amounts actually paid to the employees put them in the 15% tax bracket, assuming that they were single and claiming only one exemption. (Tr. at 149–53).

### Unreported Sales—Income Tax Liability

36. Agent Guidoboni did a number of calculations to determine the amount of unreported sales by Varjabedian, including reviewing documents prepared by Varjabedian and records from Garber Brothers. (*See, e.g.*, Tr. at 87–94; Exs. 33, 34).

37. The parties have stipulated that the amount of unreported purchases from Garber Brothers for 1997 through 2000 on the Miscellaneous Account is as follows:

| Year | Unreported Purchases |
|------|----------------------|
| 1997 | $ 296,136 |
| 1998 | $ 353,200 |
| 1999 | $ 448,774 |
| 2000 | $ 441,800 |
| Total | $1,539,990 |

(Stip. at 6–7). The parties disagree, however, as to the markup percentage on those purchases which should be used to calculate unreported sales income. (Stip. at 7).

38. Garber Brothers' suggested markup for cigarettes (which comprised the bulk of the purchases) averaged 28% between 1997–2000. (Exs. 53, 34 at 8; Tr. at 91–92; Gov't Mem. (Docket # 20) at 22).

39. Agent Guidoboni used this percentage in calculating the amount of unreported sales. (Tr. at 91, 126). As he testified, Agent Guidoboni rejected Varjabedian's handwritten sales records for the cigarettes (Ex. 48) as unreliable due to the lack of underlying sales documentation, such as cash receipts, cash register receipts, and/or summaries from such receipts. (Tr. at 96). Absent reliable taxpayer records, according to Agent Guidoboni, IRS agents are authorized to reconstruct income based on indirect methods, such as relying on the records of third parties. (Tr. at 96–97).

40. Varjabedian contends that a lower rate, ranging from 14%–19% over the years, should be applied since, according to his handwritten records seized during the search, he actually sold the cigarettes at that lesser markup rate. (Pl.'s Mem. (Docket # 21) at 5–10; Ex. 53).

41. The parties also both point to Mass. Gen. Laws ch. 64C, § 14(a) to support their position—with the government contending that it supports the use of a markup of approximately 28% and Varjabedian contending it supports a lesser markup rate.

42. Thus, during the relevant time-period, Mass. Gen. Laws ch. 64C, § 14(a) prohibited retailers from selling cigarettes at less than "cost to the retailer." Retailers could not sell cigarettes for less than "twenty-five per centum of the invoice cost of the cigarettes to the retailer ... less all trade discounts except customary discounts for

cash." Mass. Gen. Laws ch. 64C, § 13(b).

43. The parties have stipulated that the statutory rate changed to 25% in 1995 and that before then, the rate was 12%. (Tr. at 141, 144).[8] However, at trial, Varjabedian presented some evidence that the statute had historically not been enforced and that as late as October of 2003, the Massachusetts Department of Revenue (the "Mass. DOR") had a regulation on its Website stating that the statutory rate was 12%. (Exs. 41, 50; Tr. at 136–38). Varjabedian's counsel conceded that the 12% posted in 2003 was an error, but argued that the fact that retailers could have seen and applied the lower rate published on the Website supports Varjabedian's argument that, as reflected in his records, it is more realistic that he was charging less than the 25% rate. (Tr. at 143–44).

44. In calculating income tax liability, a taxpayer is entitled to deduct wages paid from the amount of income earned. In assessing, Varjabedian's income tax liability for 1999 and 2000, Agent Guidoboni gave Varjabedian a deduction for the (recalculated) amount of wages paid.

45. As Ex. 32 reflects, after including interest, other minor categorical adjustments, and penalties, Agent Guidoboni concluded that the relevant income tax liability calculations were as follows:

| Year | Unreported Purchases | Unreported Sales | Wage Deduction | Total Due |
|------|------|------|------|------|
| 1997 | $ 296,136.41 | $ 379,904.50 | - | $ 79,772.88 |
| 1998 | $ 353,199.71 | $ 453,770.98 | - | $ 83,403.23 |
| 1999 | $ 448,774.47 | $ 573,262.86 | $ 88,102.00 | $ 29,528.23 |
| 2000 | $ 441,879.56 | $ 562,908.78 | $102,676.08 | $ 10,102.06 |
| T | $1,539,990.15 | $1,969,847.12 | | $202,806.40 |

46. Thus, Agent Guidoboni concluded that the total amount due for the income tax liability was $202,806.40. This amount corresponds to the total reflected on the Notice sent to Varjabedian. (Ex. 40; Tr. at 96). In sum, the total amount assessed for Varjabedian's eventual 1997–2000 income tax liability and 1999–2001 employment tax liability was $374,171.40. (Exs. 39, 40; Gov't Mem. at 11).

47. Since Varjabedian's income tax liability for 2001 was not reviewed by the IRS, no deduction from income was made in 2001 for the additional wages the IRS found had been paid in that year. (Tr. at 113–14; Ex. 32). It is undisputed that when Varjabedian's 2001 income tax liability is recalculated, either by him in an amended return or the IRS by way of an audit, Varjabedian will be entitled to deduct the wages paid from his income. (Tr. at 112–13, 122–23, 155, 193).

48. Varjabedian has filed a separate action in the U.S. Tax Court to

---

8. The historical notes for Mass. Gen. Laws ch. 64C, § 13 also indicate that the rate was changed from 12.4% to 25% in 1995.

determine his tax liability for the years at issue. That matter is currently pending. (Tr. at 204, 206).

49. By this action, Varjabedian is seeking the return of $236,520.15, constituting the $335,000 seized less the admitted amount of employment tax liability (at 15%) for 1999, 2000 and 2001 ($98,479.85). (Pl.'s Mem. at 1 & n. 1).

## IV. RULINGS OF LAW

1. Varjabedian contests the reasonableness of the IRS' initiating the jeopardy assessment in the first place. While he also challenges the appropriateness of the amount assessed, he and the government agree on the relevant underlying numbers, and only disagree as to the calculation methods to be applied to those amounts. For the reasons that follow, this court finds that the assessment was reasonable under the circumstances and that the amount assessed was appropriate under the circumstances.

### A. The Assessment was Reasonable Under the Circumstances

2. It is undisputed that there were substantial assets belonging to Varjabedian that were held in his sister's name. (Tr. at 207). However, Varjabedian contends that this fact, even combined with all of the other evidence relied upon by the government, did not make the imposition of the jeopardy assessment reasonable.

3. "The reasonableness standard has been defined as 'something more than not arbitrary or capricious and something less than supported by substantial evidence.'" *Kenney v. United States*, 622 F.Supp. 219, 220 (D.Me.1985) (quoting *Loretto v. United States*, 440 F.Supp. 1168, 1172 (E.D.Pa.1977)).

4. It is well settled that "[t]he assessment is reasonable when at least one of the following three conditions are present:

1. The taxpayer is, or appears to be, designing quickly to depart from the United States or to conceal himself;

2. The taxpayer is, or appears to be, designing quickly to place his property beyond the reach of the Government either by removing it from the United States or by concealing it or by transferring it to other persons or by dissipating it;

3. The taxpayer's financial solvency appears to be imperiled."

*Kenney v. United States*, 622 F.Supp. at 220, and cases cited. While courts traditionally consider these three conditions, the analysis "is not in any way, shape or form restricted thereto." *Revis v. United States*, 558 F.Supp. 1071, 1074 (D.R.I.1983).

5. The government need not ultimately be correct in thinking that collection was imperilled, rather, "[t]he government only needs to prove that the circumstances *appear* to jeopardize collection." *Wellek v. United States*, 2004 WL 1541634, at *5 (citing, *inter alia*, *Cantillo v. Coleman*, 559 F.Supp. 205, 207 (D.N.J.1983)) (emphasis in original).

6. In the instant case, the government is not contending that Varjabedian was contemplating leaving the country in order to avoid his tax liability. However, the government asserts that the assessment was reasonable because the other two conditions

were present. (Tr. at 8–9). For the reasons that follow, this court finds that the government has carried its burden of establishing that the assessment was reasonable.

7. The record is replete with instances of Varjabedian's trying to place his assets beyond the government's reach. Thus, his "actions in (1) maintaining such a large hoard of currency, (2) keeping those funds in a safe-deposit box in the first place ... [and] (3) maintaining those funds in a safe-deposit box to which he had access" and controlled although the boxes were in his sister's name, all support the government's decision to protect itself via a jeopardy assessment. *Strauser v. United States*, 535 F.Supp. 957, 960 (N.D.Ill.1982); *accord Kenney v. United States*, 622 F.Supp. at 221 (discovery of $14,000 in safety deposit box supported reasonableness of jeopardy assessment).

8. Varjabedian also had many other assets in his sister's name, such as several automobiles and funds held in bank accounts. Diana's correspondence regarding many of these assets often included detailed information on the status of the holding and/or instructions for transferring the property back to Varjabedian when the time was right. It is indisputable that Varjabedian actually owned and controlled these assets notwithstanding the fact that they were in his sister's name.

9. Moreover, the government found specific references to avoiding the IRS in Varjabedian's business files. (*E.g.,* Exs. 13, 19). Varjabedian also took affirmative steps to avoid having to give his social security number to financial institutions. All of these facts also support the perception that he at least "appeared" to be designing to place his assets beyond the government's reach. *See Granse v. United States*, 892 F.Supp. 219, 223–24 (D.Minn.1995) (refusal to provide social security number to bank when opening accounts militated in favor of reasonableness of assessment).

10. Additionally, Varjabedian's behavior during the investigation, such as going to the banks the day after his home was searched, also buttresses the reasonableness of the assessment. *Cf. id.* at 224 (taxpayer's removing large sum of funds from his bank on the day jeopardy levy notice was served supported finding of reasonableness). Not only did he try to access his funds in the safe deposit boxes, he tried to stay "one step ahead of the government's search warrant of the first safe-deposit box" by going to Fleet Bank even after he was explicitly told to stay away from there. *Strauser v. United States*, 535 F.Supp. at 960. At a minimum, this conduct created the appearance that he was trying to place his assets beyond the government's reach.

11. Varjabedian's actions also created the appearance that he was trying to hide his business dealings and tax liability from the government. Thus, it is undisputed that he used postal money orders to purchase approximately $2 million in goods from Garber Brothers in a "miscellaneous" account. When purchasing the money orders, he did so in a way which appears to be designed to avoid the reporting requirement. In addition, some of

his employees told the government that Varjabedian payed them wages under the table, which also supports the conclusion that he was trying to avoid tax liability.

12. In sum, "[t]he Court concludes that [Varjabedian] was designing to place his property beyond the reach of the Government by concealing it, transferring it or by dissipating it; hence, the determination that collection would be in jeopardy was reasonable." *Granse v. United States*, 892 F.Supp. at 224.

## B. *The Amount Assessed was Appropriate Under the Circumstances*

13. The government assessed Varjabedian's income tax liability for 1997–2000 and his employment tax liability for 1999–2001. (Exs. 39, 40). For both categories of tax, the parties agree on the underlying numbers which formed the basis for the government's calculations, but dispute the percentages used to assess the taxes due. (Tr. at 177; Stip. at 6–7).

14. Varjabedian concedes that he owes $98,479.85 for the unpaid employment taxes (at a rate of 15%), and thus, only seeks the return of $236,520.15. (Pl.'s Mem. at 1 & n. 1). The government maintains that the amount assessed was appropriate in every way and asserts that it is entitled to retain the full $335,000 seized. For the reasons detailed below, the court finds that the amount assessed was appropriate under the circumstances.

15. Once the reasonableness of imposing the jeopardy proceeding has been established, the court must then consider whether the amount assessed was appropriate under the circumstances. "There is an initial presumption that the amounts assessed are suitable." *Revis v. United States*, 558 F.Supp. at 1079.

16. An essential feature of judicial review of jeopardy assessments is that the district court "is not, in a summary proceeding of this nature, the forum for determination of the actual tax liability." *Id.*, and cases cited. "In fact, plaintiff's ultimate tax liability, if any, is irrelevant to this Court's review and determination." *Miller v. United States*, 615 F.Supp. 781, 785 (N.D.Ohio 1985).

17. Rather, such claims must be brought "in a subsequent proceeding to determine the correct tax liability, be it an action for refund in a United States District Court or the United States Court of Claims, or by a proceeding in the United States Tax Court." *Cantillo v. Coleman*, 559 F.Supp. at 207.

18. Due to the circumscribed nature of the review, the court must focus on the method of computation itself, rather than the ultimate amount assessed. *See Wellek v. United States*, 2004 WL 1541634, at *7. Thus, the plaintiff must "show that the method of calculating the assessment amount is fatally defective, irrational, arbitrary, or unsupported." *Id.*

## 1. *Income Tax*

19. Varjabedian concedes that he failed to report $1,539,990 of goods he purchased from Garber Brothers on the Miscellaneous Account.

(Stip. at 6). However, for several reasons he takes issue with the manner in which the government calculated his tax liability for those goods.

20. Thus, Varjabedian argues that the government erroneously determined the cost of goods sold because it applied Garber Brothers' suggested markup rate of 28% opposed to the lower rate which he says the cigarettes were actually sold for. In addition, he asserts that the government improperly relied upon the statutory minimum rate for cigarettes set forth in Mass. Gen. Laws. ch. 64C, § 14 since the evidence shows that a much lower rate was actually used. Varjabedian also asserts that the government exceeded its authority by only assessing his employment tax for 2001 without deducting the amount paid in wages from his income tax liability for that same year, and that he is entitled to a net operating loss deduction for the income tax years 1996 through 1999 since he suffered losses in subsequent years.

## a. The Cigarette Markup Percentage

21. The parties agree that the majority of the purchases Varjabedian failed to report were for cigarettes purchased from Garber Brothers.

22. In contrast to Garber Brothers' suggested retail price, which averaged 28% over the cost of invoice during the relevant time-period, and which Agent Guidoboni relied upon when performing his calculations, Varjabedian contends that a much lower rate, ranging from 14%–19% over the years, should apply since he actually sold the cig-

arettes at that price. (Pl.'s Mem. at 5–10; Ex. 53).

23. Varjabedian's main argument is that the government erroneously disregarded his handwritten cigarette sales records (Ex. 48) since, according to Varjabedian, those records reflect his actual sales figures and profit margin during the relevant years.

24. This argument fails, however, since it is well settled that "[w]here taxpayers fail to maintain adequate books or records, the Commissioner is entitled to reconstruct the taxpayers' income through indirect methods." *Rungrangsi v. Commissioner*, 76 T.C.M.(CCH) 765, 769, 1998 WL 781140 (1998), and cases cited.

25. It has been recognized that records are inadequate if they consist only of the taxpayer's own handwritten sales records, rather than the actual underlying source documentation itself, such as cash register tapes or sales receipts. *See, e.g., Edfmon v. Commissioner*, 1993 WL 414722, 66 T.C.M. (CCH) 1093, 1098 (1993) (IRS' resort to indirect methods proper where restaurant owner could only produce handwritten sales register forms summarizing daily transactions rather than underlying income documentation); *2121 Arlington Heights Corp. v. United States*, No. 95 C 7034, 1996 WL 435051, at *1–2 (N.D.Ill. July 31, 1996) (unpublished op.) (daily reports summarizing receipt information inadequate absent cash register tapes and guest checks; government justified in using indirect methods to calculate restaurant's unreported income), *aff'd sub nom., 2121 Arlington Heights Corp. v. In-*

*ternal Revenue Service,* 109 F.3d 1221 (7th Cir.1997); *Catalanotto v. Commissioner,* 1984 WL 14470, 47 T.C.M.(CCH) 1665, 1672 (1984) (bar owner's use of handwritten recap sheets listing cash totals for each day of the month rather than actual source documentation inadequate since taxpayer "alone was the source of all information set forth on his Federal income tax returns," and the underlying sales documents were "the only documentation which would have substantiated the reliability of the gross cash receipts set forth by petitioner on the recap sheets").

26. Absent source documents, "everyone could keep a set of apparently accurate books, carefully destroy other evidences of the source and amount of income," and thereby defraud the government. *Schwarzkopf v. Commissioner,* 246 F.2d 731, 734 (3d Cir.1957).

27. Moreover, numerous courts have approved of the "use of markup percentages based upon third-party sources to determine taxable income." *Kikalos v. Commissioner,* 1998 WL 90729, 75 T.C.M. (CCH) 1924, 1929 n. 3 (1998), and cases cited, *rev'd in part on other grounds,* 190 F.3d 791 (7th Cir. 1999). That was the approach taken by the government here when it relied on Garber Brothers' suggested retail price.

28. Varjabedian also contends that the government improperly relied on the statutory minimum rate set forth in Mass. Gen. Laws. ch. 64C, § 14 which required that cigarettes be sold at a price at least 25% above the invoice cost, since his sales records reflect a lower rate. Again, Varjabedian's records were inadequate and the government was not bound to rely on them.[9]

29. Even if, as Varjabedian contends, the Mass. DOR's Website still listed 12% as the mandatory minimum rate as late as October of 2003 (Pl.'s Mem. at 8–9), his attempt to rely on the statute still fails since all parties agree that that rate was erroneously listed and Varjabedian failed to present any evidence that he, or anyone else, was confused by the conflicting rates or even knew they existed. Therefore, there is no reason to conclude that any retailers sold cigarettes below the 25% mandatory minimum because of this error.

30. Additionally, the anecdotal "mini-survey" and discussions with the Mass. DOR conducted by Mr. Norton in 2003, which purportedly indicated that ch. 64C was rarely enforced and that five out of six gas stations observed within one mile of the Sunoco Station sold cigarettes below the statutory rate, does not render the amount assessed inappropriate. (Tr. at 136–40). Not

9. Although the government asserts that the statutory minimum rate supports the 28% rate used by Agent Guidoboni (Tr. at 145), it is unclear if the government actually relied on the statute during the jeopardy assessment. Agent Guidoboni did not testify to doing so and Agent Blackmore explicitly stated that he did not consider the statutory rate. (Tr. at 73–75). However, it is irrelevant whether they did so or not since the court can consider any information which bears on the issues before it, not only the information considered by the IRS. *See Guillaume v. Commissioner,* 290 F.Supp.2d at 1353. Thus, even if not considered by the IRS during the assessment, ch. 64C supports the government's use of the 28% rate.

only does this information post-date the applicable time-period, the fact that other retailers may be selling cigarettes at a certain price does not prove that Varjabedian was also selling his product at a lower price.

31. Contrary to Varjabedian's assertions, it was not inconsistent for the government to accept his handwritten wage payment records as reliable, yet reject his handwritten cigarette sales records. (Pl.'s Mem at 4–5 & n. 4). Unlike cigarette sales, which presumably generate some type of cash register receipt, there is no corresponding inherently reliable documentation for under the table wages; by definition such payments are unrecorded. (Tr. at 10; Pl.'s Mem. at 10 ("[t]he **income tax** consequences of the hitherto *secretly paid* wage supplements ....") (second emphasis added)).

32. For all these reasons, the plaintiff has not met his burden of proving that the government's reliance on Garber Brothers' suggested retail price was fatally defective, irrational, arbitrary, or unsupported, and the amount assessed based thereon was appropriate under the circumstances.

a. *The Failure to Deduct the 2001 Wage Payments*

33. Varjabedian also objects to the fact that the government determined that he had made unreported wage payments in 2001, for which it is assessing him employment taxes, but it did not give him a deduction on his 2001 income taxes for such wages because it did not recalculate his 2001 income tax liability. Thus,

Varjabedian contends that the government's action in assessing employment tax liability for 1999–2001 but income tax liability for only 1997–2000 was arbitrary and capricious, and that it deprived him of a significant net operating loss ("NOL"), discussed *infra*, which could be applied retroactively to the years at issue. (*See* Tr. at 156–57). The plaintiff's argument is unpersuasive.

34. It was not arbitrary for the government to refuse to deduct the previously unreported wages paid in 2001 from the income Varjabedian reported in 2001 prior to a full IRS audit. Given the plaintiff's long history of under-reporting income, it is a logical inference that the 2001 reported figure was too low as well. The burden is on the plaintiff to convince the court that the amount of the assessment was inappropriate. However, he has proffered no evidence that his accounting methods in 2001 differed from the earlier years of underreporting. Therefore, he has not met his burden of proof.

35. Varjabedian will be able to claim the revised deduction amount either by filing an amended tax return (*see* Tr. at 159) or in connection with a government required review. The amount of the assessment was not rendered inappropriate under the circumstances due to the government's failure to provide for a deduction of the wages paid in 2001.

36. Similarly, the fact that different years were assessed for employment and income taxes does not render the government's actions inappropriate. As the government candidly admits, "once

the IRS had found enough tax liabilities to secure the $335,000 there was no need to pursue the taxpayer's other liabilities." (Gov't Mem. at 27). This is not a situation where the amount of liability has no factual basis other than that it coincides with the amount of the cash seized. *See and compare Henderson v. United States,* 949 F.Supp. 473, 476 (N.D.Tex.1996) (court finds fact that the amount of employment taxes due slightly exceeded the amount of cash seized to be suspect absent factual basis for tax calculations). Rather, here, in each year the government found unreported income which exceeded the amounts of wages paid resulting in a tax obligation. There is nothing suspect in limiting the assessment to the amount of cash seized and allowing subsequent tax analysis to follow the normal audit route.

37. Finally, the instant case is not comparable to *D'Orio v. United States,* No. C88–970A, 1988 WL 126522 (N.D.Ohio July 28, 1988), on which plaintiff relies. In *D'Orio,* a taxpayer brought suit under § 7429 to challenge a jeopardy assessment. *Id.* at *1. The IRS had issued a notice of deficiency for the tax years 1981 and 1982, and the taxpayer challenged the availability of a particular deduction for those years in tax court. *Id.* The taxpayer's new accountant then filed amended returns for 1981 and 1982, claiming that the taxpayer was entitled to net operating loss carryback credits from subsequent years which nullified the taxpayer's 1981 and 1982 tax liability. *Id.* at *2. Then, the government initiated a jeopardy assessment against the taxpayer for the 1981 and 1982 tax years. *Id.* at *1. However, due to no fault of the IRS, because the amended returns were not matched with the initial returns, the amended returns were not analyzed by the IRS in connection with the jeopardy assessment. *Id.* at *2. The court found that while it was reasonable for the government to initiate the proceeding, the amount assessed was inappropriate because the amended returns, reflecting the net operating loss deductions, had not been considered although they were undisputed. *Id.* at *3. Consequently, the court abated the assessment and ordered the government to recalculate the plaintiff's tax liability in light of the amended returns. *Id.* at *4.

38. In the instant case, of course, the figures which Varjabedian has asked the government to consider are disputed. The final tax calculations should appropriately be decided in a non-summary fashion. It was not inappropriate for the government to limit its audit.[10]

b. *The Net Operating Loss Deductions*

39. Varjabedian also contends that he is entitled to net operating

10. Varjabedian has also asserted that the government wrongfully limited its analysis because Agent Guidoboni did not make a mandatory comment pursuant to two sections of the IRM which, according to Varjabedian, is required whenever an agent does not inspect the tax years immediately preceding and following an audited year. (Pl.'s Mem. at 15–16). However, even assuming, *arguendo,* that such a comment was required under the circumstances of this case, Varjabedian has failed to establish that violating that provision by failing to make a comment requires that the jeopardy assessment be invalidated.

loss deductions in accordance with 26 U.S.C. § 172 based on his negative tax liability for the years 2000, 2001, and 2002.[11] (Pl.'s Mem. at 17–19). According to Mr. Norton, the losses sustained in these years can be carried back to the 1996 through 1999 tax years. (Tr. at 153–61; Exs. 55, 57).

40. The government objects on the grounds that neither the 2001 nor 2002 income tax years are at issue here since they were not included in the jeopardy assessment, because Varjabedian has not even amended his returns to include these claims, and because to determine if Varjabedian is, in fact, entitled to a net operating loss for any of the previous years, the court will have to calculate his tax liability for each loss year and each carry back year, which is beyond the scope of this judicial review. (Gov't Mem. at 24–28 & n. 8; Tr. at 106–07). For the reasons that follow, this court will not apply a net operating loss deduction to any of the years.

41. As the government argues, before any net operating loss can be applied, Varjabedian's actual income tax liability for the loss year, as well as any carry back years, must be established. *See* 26 U.S.C. § 172(b)(2), (c) & (e). Mr. Norton too testified that the taxpayer's tax liability must first be established before any net operating loss can be applied. (Tr. at 156). Making such findings is beyond the scope

of this proceeding since, again, "[t]he district court is not, in a summary proceeding of this nature, the forum for determination of the actual tax liability." *Revis v. United States,* 558 F.Supp. at 1079. Rather, such issues must be resolved in a subsequent action. *See, e.g., Harvey v. United States,* 730 F.Supp. 1097, 1109 (S.D.Fla.1990) (plaintiff's claim that he was entitled to reduction in tax liability based on maximum tax rates, income averaging, foreign residence exclusions, and Subpart F income not properly addressed in challenge to jeopardy assessment); *Bremson v. United States,* 459 F.Supp. 121, 125 n. 10 (W.D.Mo.1978) (court rejects taxpayer's contention that amount assessed was inappropriate based on IRS' failure to consider, *inter alia,* business deductions, income averaging, and other "assorted items" since taxpayer's ultimate tax liability is irrelevant in § 7429 proceedings).

42. Moreover, even Mr. Norton conceded that the net operating loss issue is not ripe for review at this time since Varjabedian has not amended his returns to claim such a loss (Tr. at 173–75, 178) and because, at least for 2001 and 2002, the issue must first be addressed with the IRS in the appeals process. (Tr. at 178–79; Pl.'s Mem. at 21 n. 29). Thus, this court is an improper forum for Varjabedian to

---

**11.** Varjabedian acknowledges that the figures contained in the 2002 tax return he recently filed were not available to the IRS back in December of 2002 when the jeopardy assessment was conducted. However, he contends that since the court can look to later events to determine the appropriateness of the amount assessed and because the goal of these proceedings is "to determine whether any taxes are due and owing," the court should consider the losses allegedly sustained in 2002. (Tr. at 156–58).

pursue his net operating loss deductions.

43. As detailed above, *D'Orio v. United States,* No. C88–970A, 1998 WL 126522 (N.D.Ohio July 28, 1988), relied on by Varjabedian, is inapplicable to the instant case. In *D'Orio,* there was no dispute that the taxpayer was entitled to a net operating loss carryback. *Id.* at *3–4. Here, all issues relating to Varjabedian's proposed calculations are disputed.

### 2. *Employment Tax*

44. Based on Varjabedian's handwritten wage payment records (Ex. 49), the parties agree that he failed to report $325,016 in wages from 1999–2001. (Stip. at 6; Tr. at 148–49). However, Varjabedian challenges the withholding rate the government applied to those wages.

45. Thus, Varjabedian contends that the government improperly applied a 28% withholding rate, as suggested by the IRM, since the employees were paid on a weekly basis opposed to in a lump sum in the fourth quarter of the respective years. (Pl.'s Mem. at 11–15; Gov't Mem. at 20–21; Ex. 35). According to Varjabedian, the correct rate is 15% and, based on that rate, he has agreed to pay $98,479.85 for the 1999–2001 employment taxes. (Pl.'s Mem. at 1 n. 1, 11–13 & n. 15; Exs. 53, 58; Tr. at 149).

46. Varjabedian contends that Agent Guidoboni improperly viewed IRM §§ 4.23.8.4 and 4.23.8.8 as mandatory and applied the 28% rate from

those sections despite the fact that evidence existed that the wages were actually paid at the lower rate of 15%. Whether these sections of the IRM are technically mandatory or nor not, an issue on which the court takes no position, it was not inappropriate for Agent Guidoboni to rely on them and apply the 28% rate.

47. IRM § 4.23.8.8 states that:

(1) IRC section 3402 requires employers to deduct and withhold income tax from payments of wages. When income tax withholding is involved, and IRC section 3509 [12] is not applicable, use the supplemental wage rates as shown in IRM 4.23.8.4(1) & (2).

(2) Where the employer can establish the employee's allowable number of exemptions, from the W–4 on file for the employees during the audit years, the computation can be made based on the laws and regulations in existence during those years . . . .

48. In turn, IRM § 4.23.8.4 provides in relevant part that:

(1) When income tax withholding is involved, and IRC section 3509 is not applicable, the withholding is either computed under existing law and regulations or the supplemental wage rate in Reg. Section 31.3402(g–1). Public Law 107–16 reduced the supplemental wage flat withholding rate for wages paid after August 6, 2001 to 27.5% . . . . For payments made before August 7, 2001, the withholding

---

12. It is undisputed that § 3509, which relates to independent contractors, is inapplicable to the instant case.

rate on supplemental wages was 28% .... [13]

49. These provisions are both part of the IRS' "Employment Tax Handbook," which "serves as the foundation for consistent administration of employment taxes by various IRS operating divisions. By providing one source of authority for all operating divisions, the Service greatly reduces inconsistencies regarding philosophies, as well as, procedures." IRM § 4.23.1.1(3). Moreover, "[t]he handbook is designed for use as an everyday reference guide. It serves as the single official compilation of policies, procedures, instructions and guidelines relating to employment taxes." IRM § 4.23.1.2(2). Thus, it is clear that the IRS intended for the Handbook's provisions to be applied uniformly whenever implicated, not merely at the particular agent's discretion. Therefore, Agent Guidoboni's reliance on IRM §§ 4.23.8.4 and 4.23.8.8 was not inappropriate.

50. Varjabedian also asserts that the government's 28% rate is erroneous because most of the employees were clearly identifiable from either the handwritten records or W-4s already on file with the IRS, which would have shown that such employees were actually entitled to decreased withholdings. (Pl.'s Mem. at 13 n. 15; Tr. at 152–53). Although not explicitly relied upon by Varjabedian,

IRM § 4.23.8.8(2), which provides that a rate lower than 28% can be applied if the employer establishes the employees' actual number of exemptions, arguably supports his position. Thus, according to Varjabedian, the government should have sought out the additional information on his employees in order to invoke the lower withholding rates. (Tr. at 115–16). This argument fails, however, because Varjabedian has not produced any W-4s to substantiate his claim, and has not otherwise established what the alternative rates should be. Based on both the IRM and § 7429(b), the burden is on Varjabedian, not the government, to prove that the rates are inappropriate. This he has not done.

51. Moreover, Mr. Norton did not consider the employees' actual W-4s either, he merely confirmed with Varjabedian and Varjabedian's accountant that such documents existed. (Tr. at 152–53). In fact, he based his conclusion that the 15% rate should apply on "the very same records" the government used to calculate the employees' wages. (Tr. at 150). This further supports the conclusion that Varjabedian has failed to carry his burden of establishing that the government was obligated to apply, at this stage, the 15% rate to the employees.

---

**13.** At the time of the assessment, the current version of § 4.23.8.4 had not yet been published and the prior version stated that for payments made after August 6, 2001, the rate was 28%. Thus, Agent Guidoboni applied the higher rate. (Tr. at 126–27). Although Agent Guidoboni conceded that the lower rate would apply if he were making the assessment today, it was not inappropriate for him to apply the 28% since that was the only rate available at the time and, even now, the higher rate only applies to part of one of the years at issue.

52. In addition, taken at face value even Mr. Norton's testimony does not establish that it was inappropriate to apply the 28% rate or that Agent Guidoboni was bound to apply a different rate. Mr. Norton testified that during his experience at the IRS, it was rare to resort to the 28% rate, and that it was only done "where the case were either without proof or it was impossible to determine who the employees were that received the amount of wages for the periods for which those wages were paid." (Tr. at 151). However, he concluded that "if a taxpayer could demonstrate through *clear and convincing evidence* the amount of the payment on a weekly basis ... and it was clear that those amounts are accurate, then, you know, we would certainly *consider* using the actual rates[.]" (Tr. at 151) (emphasis added). Thus, according to Mr. Norton, application of the lower rate is not automatic even if the underlying wage records are available.

53. If Varjabedian has evidence that lower withholding rates should have applied, "he is free to assert that fact in the ultimate trial of his income tax liability." *Strauser v. United States,* 535 F.Supp. at 962. (Tr. at 104). However, he has failed to prove that the amount assessed for his employment tax was inappropriate in this case.

## V. *CONCLUSIONS AND ORDER*

1. The imposition of the jeopardy assessment was reasonable under the circumstances.

2. The amount assessed was appropriate under the circumstances.

3. Judgment shall enter in favor of the defendant.